## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD A. SPRAGUE, et al.** | : | |
| | : | |
| **Plaintiffs,** | : | |
| **v.** | : | **1:16-CV-02169** |
| | : | **(JUDGE MARIANI)** |
| **PEDRO A. CORTES** | : | |
| | : | |
| **Defendant.** | : | |

### MEMORANDUM OPINION

#### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court is a Motion to Dismiss (Doc. 19) filed by Defendant Pedro

A. Cortés, Secretary of the Commonwealth of Pennsylvania. The Motion to Dismiss seeks

dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter

jurisdiction, or in the alternative, dismissal pursuant to Rule 12(b)(6) for failure to state a

claim upon which relief can be granted, or Rule 12(b)(7) for failure to name indispensable

parties. (Doc. 20, at 3).

On October 27, 2016, Plaintiffs Richard Sprague, Hon. Ronald Castille, and Hon.

Stephen Zappala, Sr. filed a complaint in the above-captioned matter naming as Defendant

Pedro Cortés, the Secretary of the Commonwealth of Pennsylvania. (Doc. 1). Plaintiffs

subsequently filed an Amended Cornplaint (Doc. 9) and Second Amended Complaint (Doc.

17) which, added as an exhibit the Affidavit of Berwood A. Yost and modified a

corresponding paragraph in the complaint (Doc. 9), added Hillel S. Levinson and the Hon.

John W. Herron as Plaintiffs, and included an allegation that the Court also has jurisdiction

pursuant to 28 U.S.C. § 1343 (Doc. 17).  The Second Amended Complaint requests

Declaratory Judgment and Injunctive Relief pursuant to 42 U.S.C. § 1983 (Counts I, II) and

Declaratory and Injunctive Relief pursuant to Pennsylvania Law (Count III).

Defendant moved to dismiss the Second Amended Complaint on November 10,

2016, (Doc. 19), to which Plaintiffs filed a brief in opposition (Doc. 31), Defendant filed a

reply brief (Doc. 32), and Plaintiffs filed a sur-reply brief (Doc. 37).  Jeffrey A. Manning,

Donna J. McDaniel, Michael J. Della Vecchia, David R. Cashman, John P. Garhart and

John M. Cascio filed an *amicus curiae* brief in support of Defendant's Motion to Dismiss.

(Doc. 25).[1]

The issues have been fully briefed and Defendant's Motion is ripe for disposition. For

the reasons set forth below, the Court will grant Defendant Cortés Motion to Dismiss.

## II. FACTUAL ALLEGATIONS

Plaintiffs' Second Amended Complaint alleges the following facts[2]:

Plaintiffs in this action are Richard A. Sprague, a member of the Pennsylvania Bar,

the Honorable Ronald D. Castille and Honorable Stephen Zappala, Sr., both former Chief

Justices of the Pennsylvania Supreme Court, the Honorable John W. Herron, a current

---

[1] The brief of the *amici* judges was submitted to address "two, distinct issues: standing and the second amended complaint's utter failure to state a federal claim." (Doc. 25, at 2).

[2] Plaintiffs' Second Amended Complaint was filed prior to the November 8, 2016 general election. Therefore, where necessary, the Court has changed Plaintiffs' allegations of future action to reflect that the action has been taken.

2

senior judge of the Pennsylvania Court of Common Pleas, Philadelphia County, and Hillel S. Levinson, an inactive member of the Pennsylvania Bar.  Each Plaintiff is a resident and citizen of the Commonwealth of Pennsylvania, a registered voter, a taxpayer of the Commonwealth of Pennsylvania, and is eligible and intended to vote in the November 2016 general election in the Commonwealth of Pennsylvania.  (Doc. 17, ¶¶ 1-5).

Defendant Pedro A. Cortés, Esq. is the Secretary of the Commonwealth of Pennsylvania.  In that capacity, Defendant is responsible for determining and publishing the language that appears on statewide ballots concerning any proposed amendment to the Pennsylvania Constitution, including the proposed constitutional amendment at issue in the present action.  (*Id.* at ¶ 6).

Currently, the operative Pennsylvania Constitution is the fifth Constitution that has governed the Commonwealth since the United States declared its independence in 1776.  (*Id.* at ¶ 9).  Following a Constitutional Convention held in 1967 and 1968, Pennsylvania voters adopted the presently-controlling Pennsylvania Constitution, which revised the judiciary article of the previous Constitution and set a mandatory retirement age for justices of the Pennsylvania Supreme Court, lower court judges, and magisterial district judges.  (*Id.* at ¶ 11).

Article V, Section 16(b) of the original 1968 Pennsylvania Constitution required all judicial officers of the Commonwealth to retire immediately upon attaining the age of 70.

3

(*Id*. at ¶ 12). In 2001, primary ballots across the Commonwealth of Pennsylvania contained the following question asking Pennsylvania voters if they wished to amend Article V, Section 16(b) of the original 1968 Pennsylvania Constitution: "Shall the Constitution of Pennsylvania be amended to provide that justices of the Supreme Court, judges and justices of the peace shall be retired on the last day of the calendar year in which they attain the age of 70 years, rather than on the day they attain the age of 70?" (Doc. 17, ¶ 13). Over 67% of the voters who answered this ballot question voted "yes." As a result, Article V, Section 16(b) of the Pennsylvania Constitution was amended to require that the Commonwealth's judicial officers must retire on the last day of the calendar year in which they reach the age of 70. (*Id*. at ¶ 14).

Following the 2001 amendment to Article V, Section 16(b), various members of the legislature introduced several unsuccessful bills proposing to amend the Pennsylvania Constitution to either raise the mandatory judicial retirement age beyond 70 or to abolish the constitutional requirement that the Commonwealth's judicial officers retire upon reaching a certain age. (*Id*. at ¶ 15).

In 2013, several groups of Pennsylvania jurists "sought to renew the attack on Article V, Section 16(b) via multiple legal actions commenced in both federal and state courts." (*Id*. at ¶ 16) (quoting *Driscoll v. Corbett*, 69 A.3d 197, 200 (2013)). The Pennsylvania Supreme Court joined the federal courts in rejecting these legal challenges, noting that the only way to increase or eliminate Pennsylvania's constitutionally-mandated judicial retirement age "is

to pursue further amendment to the Pennsylvania Constitution." (Doc. 17, ¶ 17) (quoting *Driscoll*, 69 A.3d at 215).

After the Pennsylvania Supreme Court confirmed the legality of Article V, Section 16(b)'s requirement, the State House of Representatives considered a resolution proposing to present the state electorate with a ballot question regarding whether the constitutionally-mandated judicial retirement age should be raised from 70 to 75.  (Doc. 17, ¶ 18).

Pursuant to Article XI, Section 1 of the Pennsylvania Constitution, in order for a resolution to result in a Constitutional amendment, it must be approved by a majority vote of both houses of the Pennsylvania General Assembly in two consecutive sessions, as well as "submitted to the qualified electors of the State" and "approved by a majority of those voting thereon." (*Id*. at ¶ 19).

The first affirmative vote by the Pennsylvania General Assembly came on October 22, 2013, when the General Assembly passed H.B. 79, a joint resolution proposing to amend Article V, Section 16(b) to require that the Commonwealth's jurists retire on the last day of the year in which they attain 75, rather than 70. (*Id*. at 20).  Following the affirmative vote, the Secretary of the Commonwealth published notice of the proposed amendment through advertisements in newspapers throughout the Commonwealth. (*Id*. at ¶ 21).

During the next legislative session, on November 16, 2015, the General Assembly passed H.B. 90, a joint resolution identical to the preceding session's H.B. 79.  (Doc. 17, ¶ 22).  Consistent with the requirements of the Election Code, 25 P.S. § 2621(c), H.B. 90 also

5

directed the Secretary of the Commonwealth to develop a ballot question concerning the Pennsylvania General Assembly's proposal to amend Article V, Section 16(b) and to submit that ballot question "to the qualified electors of this Commonwealth at the first primary, general or municipal election . . . which occurs at least three months after the proposed constitutional amendment is passed by the General Assembly." (*Id*. at ¶ 23).

As required by Article XI, Section 1 of the Pennsylvania Constitution and H.B. 90, the Secretary of the Commonwealth published notice of the proposed amendment in newspapers across the commonwealth along with a "plain English" statement prepared by the Attorney General explaining "the purpose, limitations and effects of the ballot question on the people of the Commonwealth." (*Id*. at ¶ 24) (citing 25 Pa.C.S. § 2621.1). The Secretary's public notice explained that Pennsylvania voters would be asked to approve or deny the proposed amendment to Article V, Section 16(b) of the Pennsylvania Constitution by answering "yes" or "no" to the following ballot question developed by the Secretary:

Shall the Pennsylvania Constitution be amended to require that justices of the Supreme Court, judges and justices of the peace (known as magisterial district judges) be retired on the last day of the calendar year in which they attain the age of 75 years, instead of the current requirement that they be retired on the last day of the calendar year in which they attain the age of 70?

(Doc. 17, ¶ 25).

Thereafter, Pennsylvania election officials created ballots for the April 26, 2016 primary election containing the above-quoted question regarding the proposed amendment to the Pennsylvania Constitution. (*Id*. at ¶ 26).

6

The Secretary developed the language of this April 2016 primary election ballot question in accordance with Section 201 of the Pennsylvania Election Code, 25 P.S. § 2621(c), which vests the Secretary of the Commonwealth with authority over "the form and wording of constitutional amendments or other questions to be submitted to the State at large." (*Id*. at ¶ 27). Consistent with the Pennsylvania Election Code's delegation of authority over ballot questions to the Secretary of the Commonwealth, neither H.B. 79 nor H.B. 90 suggested or set forth language for a ballot question concerning the proposed amendment. (Doc. 17, ¶ 28).

Around the time of the Pennsylvania General Assembly's approval of the second joint resolution, controversy began surrounding the Pennsylvania judiciary due to alleged misconduct by several Pennsylvania Supreme Court Justices as well as certain lower state court judges and magisterial district judges. (*See* Doc. 17, ¶¶ 29-35). Plaintiffs allege that these controversies "garnered mass media attention and cast doubt on the Pennsylvania electorate's willingness to amend the Constitution to extend the limited tenure of Pennsylvania Supreme Court justices, judges and magisterial district judges." (*Id*. at ¶ 35). As a result, a group of legislators sought to strike certain portions of the ballot question that the Secretary had developed for the April 2016 primary election regarding the proposed amendment to Article V, Section 16(b) of the Pennsylvania Constitution. (*Id*.). Specifically, the legislators sought to strike from the ballot question any reference to the Pennsylvania Supreme Court as well as any indication that the proposed amendment would raise the

constitutionally-mandated retirement age for Pennsylvania Supreme Court justices, judges

and magisterial district judges by five years. (*Id.* at ¶ 36).

On March 6, 2016, the Pennsylvania Senate Majority Caucus, Senate President Pro

Tempore Joe Scarnati, and Senate Majority Leader Jake Corman filed an "Emergency

Application for Extraordinary Relief" asking the Pennsylvania Supreme Court to "strike the

following terms and phrases" from the Secretary's ballot question regarding the

Pennsylvania General Assembly's proposed amendment to Article V, Section 16(b):

> Shall the Pennsylvania Constitution be amended to require that Justices of
> the Supreme Court, judges and justices of the peace (known as magisterial
> district judges) be retired on the last day of the calendar year in which they
> attain the age of 75 years, instead of the current requirement that they be
> retired on the last day of the calendar year in which they attain the age of 70?

(Doc. 17, ¶ 37).

The Senators' Emergency Application for Relief set forth three arguments in support

of their request that the Pennsylvania Supreme Court strike the above-language from the

ballot question: (1) the phrase "of the Supreme Court" after the word "Justices" would

confuse voters into thinking the proposed amendment would apply to justices of the United

States Supreme Court, and the phrase "known as magisterial district judges" after the term

"justices of the peace" would mislead voters into thinking "that the proposed amendment

does not apply to judges of the court of common pleas, the Superior Court, and the

Commonwealth Court;" (2) the "terms and phrases sought to be stricken are inconsistent

with the proposed constitutional amendment . . . ."; and (3) the phrase "instead of the

8

current requirement that they be retired on the last day of the calendar year in which they

attain the age of 70" was "nothing more than superfluous and gratuitous commentary," and

a ballot question regarding a proposed constitutional amendment need not state "what the

current state of the law may be at the time of the proposed amendment." (*Id.* at ¶ 38).

On March 11, 2016, the Secretary of the Commonwealth filed an Answer in

Opposition to the Emergency Application for Extraordinary Relief, arguing that the Senators'

Application should be denied because the Senators' proposed ballot question "would deny

Pennsylvania voters relevant information regarding the proposed constitutional

amendment." (*Id.* at ¶ 39). Specifically, the Secretary argued that "the phrase 'instead of

the current requirement that they be retired on the last day of the calendar year in which

they attain the age of 70' should remain on the ballot question" because a ballot question

that does not advise voters that "the *existing* language in the Constitution would be *changed*

to 75 *instead of* 70 . . . would likely leave the voter wondering what the current requirement

is – or worse yet, leave the voter with the impression that there is no requirement at all." (*Id.*

at ¶ 40) (emphasis in Secretary's Answer). The Secretary's Answer in Opposition to the

Senators' Application for Extraordinary relief explained that the Senators' proposed ballot

question would "deprive voters of relevant information on the ballot itself regarding the

mandatory retirement age requirement as it currently exists in the Pennsylvania

Constitution." (*Id.* at ¶ 41).

However, soon after opposing the Senators' Application for Extraordinary Relief, the Secretary agreed to present the voters of the Commonwealth with a ballot question that was nearly identical to the question that the Secretary had previously argued would mislead voters. (*Id.* at ¶ 42).

On March 22, 2016, the Senators who filed the Emergency Application for Relief, the Secretary, the Pennsylvania Department of State, and the Office of the Pennsylvania Attorney General filed a Joint Application for Extraordinary Relief requesting that the Pennsylvania Supreme Court approve a stipulation providing that the Secretary of the Commonwealth would: (1) remove from the April 26, 2016 primary election ballots the question that the Secretary had initially developed concerning the General Assembly's proposal to amend the Constitution by raising the constitutionally-mandated judicial retirement age from 70 to 75, (2) direct the county boards of elections to do the same, and (3) place on the November 8, 2016 general election ballot in the Commonwealth of Pennsylvania the following question:

> Shall the Pennsylvania Constitution be amended to require that justices of the Supreme Court, judges, and magisterial district judges be retired on the last day of the calendar year in which they attain the age of 75 years?

(Doc. 17, ¶ 43).

On March 23, 2016, the Pennsylvania Supreme Court entered an Order denying the Senators' Emergency Application for Extraordinary Relief and the Joint Application seeking approval of the Stipulated Resolution and modified ballot question. (*Id.* at ¶ 44).

Following the Pennsylvania Supreme Court's denial of the Joint Application seeking

to change the ballot question that the Secretary of the Commonwealth had devised for the

April 2016 primary election pursuant to the Secretary's authority, groups of Pennsylvania

legislators introduced concurrent resolutions to remove the proposed Amendment from the

April 2016 primary ballot, to place the proposed amendment on the November 2016 general

election ballot, and to require the Secretary to adopt a ballot question drafted by the General

Assembly. (*Id.* at ¶ 45). On April 6, 2016, the Pennsylvania House of Representatives

approved one such concurrent resolution, H.R. 783, and the Pennsylvania Senate approved

the resolution on April 11, 2016. (*Id.* at ¶ 46).

Because the Pennsylvania General Assembly approved H.R. 783 approximately two

weeks prior to the 2016 primary election, the General Assembly recognized that it would be

impossible for the Secretary to remove his previously-devised question from the statewide

primary election ballots; accordingly, H.R. 783 directed the Secretary to "disregard any vote"

on the proposed amendment, and the Resolution instructed county boards of election that,

"to the extent possible," they were to remove from the April 2016 primary election ballots the

original question devised by the Secretary of the Commonwealth. (*Id.* at ¶¶ 47, 48). The

Resolution further directed the Secretary to place on the November 8, 2016 general election

ballot the question drafted by the Pennsylvania General Assembly which omits that the

proposed amendment would increase the mandatory retirement age. (*Id.* at ¶ 49).

According to Plaintiffs, H.R. 783 thus attempted to divest the Secretary of his authority over

"the form and wording of constitutional amendments or other questions to be submitted to

the State at large." (Id.).

Specifically, H.R. 783 directed the Secretary to place the following proposed

constitutional amendment on the ballot for the general election on November 8, 2016:

> Shall the Pennsylvania Constitution be amended to require that justices of the
> Supreme Court, judges, and magisterial district judges be retired on the last
> day of the calendar year in which they attain the age of 75?

(Doc. 17, ¶ 50). Thus, the differences between the ballot question developed by the

Secretary of the Commonwealth for the April 2016 primary election and the ballot question

set forth by the Pennsylvania General Assembly in H.R. 783 are as follows:

> Shall the Pennsylvania Constitution be amended to require that justices of the
> Supreme Court, judges and ~~justices of the peace (known as~~ magisterial
> district ~~judges)~~ be retired on the last day of the calendar year in which they
> attain the age of 75 years~~, instead of the current requirement that they be
> retired on the last day of the calendar year in which they attain the age of 70~~?

(Id. at ¶ 51).

On April 14, 2016, a group of state legislators asked the Pennsylvania

Commonwealth Court to preliminarily enjoin the Secretary from implementing H.R. 783

because of the alleged improper process through which the Pennsylvania General

Assembly passed the concurrent resolution purportedly contravening the Secretary of the

Commonwealth's authority under Pennsylvania law. (Id. at ¶ 53). Specifically, State

Senators Joy Costa, Daylin Leach, and Christine M. Tartaglione filed an Application for a

Preliminary Injunction seeking to enjoin the Secretary of the Commonwealth from

implementing H.R. 783 on the grounds that the concurrent resolution: (1) unconstitutionally

directed the Secretary to infringe on the rights of voters who had already cast absentee

ballots; (2) should have been presented to the Governor for his approval; and (3) compelled

the Secretary of the Commonwealth to act contrary to his duties with respect to the legal

process for voting on a constitutional amendment. (*Id.* at ¶ 54). On April 20, 2016, the

Pennsylvania Commonwealth Court found that the three senators did not meet the high

burden required to obtain preliminary injunctive relief and declined to preliminarily enjoin

H.R. 783 in advance of the April 2016 primary election. (*Id.* at ¶ 55).

Thus, although the Secretary of the Commonwealth was prohibited from conducting

an official tally of the vote, the April 2016 primary election ballots across the Commonwealth

contained the original question developed by the Secretary. According to the Pennsylvania

Department of State, 2,395,250 Pennsylvania citizens answered the ballot question, with

50.99% voting "no" and 49.01% voting "yes." (*Id.* at ¶¶ 57, 58). Pursuant to H.R. 783, the

electorate's vote at the April 2016 primary election against amending the Pennsylvania

Constitution was invalidated and had no legal effect. (*Id.* at ¶ 59).

The Secretary of the Commonwealth thereafter placed on the November 2016

general election ballot in the Commonwealth of Pennsylvania the following question set

forth by the General Assembly in H.R. 783:

Shall the Pennsylvania Constitution be amended to require that justices of the
Supreme Court, judges, and magisterial district judges be retired on the last
day of the calendar year in which they attain the age of 75?

13

(Doc. 17, ¶ 60).

On July 6, 2016, a panel of the Pennsylvania Commonwealth Court held that the Pennsylvania General Assembly acted within its authority by passing the portions of H.R. 783 withdrawing the proposed constitutional amendment to Article V, Section 16(b) from the April 2016 primary election ballot and placing the proposed amendment on the November 2016 general election ballot. (*Id.* at ¶ 61). Plaintiffs contend that the Commonwealth Court's Opinion does not address the propriety of the language of the ballot question regarding the General Assembly's proposed amendment to Article V, Section 16(b) but that the Commonwealth Court implicitly acknowledged that one cannot understand the effect and purpose of the proposed amendment without knowing the present law regarding judicial retirement. (*Id.* at ¶¶ 62, 63).

On July 21, 2016, Plaintiffs Sprague, Castille, and Zappala filed suit in the Pennsylvania Supreme Court[3] seeking a declaration that the Secretary's ballot question was unlawfully misleading, and requesting an order directing the Secretary to present Pennsylvania voters with a ballot question advising that the proposed amendment would result in raising the current constitutionally-mandated compulsory judicial retirement age of 70 to 75. (*Id.* at ¶ 65). Plaintiffs also filed an Emergency Application for Extraordinary

---

[3] A review of the pleadings shows that Plaintiffs erroneously allege that the suit was initially filed in the Pennsylvania Supreme Court. Instead, the record reflects that Plaintiffs' action was filed in the Commonwealth Court and was followed by Plaintiffs' Emergency Application for Extraordinary Relief requesting that the Pennsylvania Supreme Court exercise extraordinary jurisdiction over the case.

Relief requesting that the Pennsylvania Supreme Court exercise extraordinary jurisdiction over the case. (*Id*. at ¶ 66).

On July 27, 2016, the Pennsylvania Supreme Court entered an Order granting Plaintiffs' Emergency Application for Extraordinary Relief, thus assuming plenary jurisdiction over the matter that Plaintiffs had filed in the Commonwealth Court. (*Id*. at ¶ 68). The Secretary timely filed an Answer and New Matter on August 3, 2016. (Doc. 17, ¶ 69). The following day, Plaintiffs filed an Application for Summary Relief requesting that the Pennsylvania Supreme Court enter judgment in their favor based on the pleadings that Plaintiffs and the Secretary had filed. (*Id*. at ¶ 72). The Secretary filed an Answer to Plaintiffs' Application for Summary Relief on August 12, 2016. (*Id*. at ¶ 76).

Because the Pennsylvania Supreme Court had not yet issued a ruling on Plaintiffs' Application for Summary Relief and in accordance with the briefing schedule issued by that Court, on August 9, 2016, Plaintiffs filed a brief addressing the merits of their Complaint. (*Id*. at ¶ 73). Plaintiffs' brief set forth two arguments: (1) because the ballot question fails to mention that the Pennsylvania Constitution currently requires state court jurists to retire at the age of 70, the ballot question at issue would result in voter deception because voters both for and against restricting the tenure of state court jurists would be misled by the ballot question into voting contrary to their intentions, and the election results would not reflect their true will; and (2) as the Secretary previously argued to the Pennsylvania Supreme Court, the ballot question cannot be cured by supplemental information provided in the

newspaper advertisements or postings of the "plain English statement" that the Election Code requires. (*Id.* at ¶ 74). Plaintiffs stated that the Secretary was correct when he argued to the Supreme Court in March 2016 that the fatal defect in the ballot question at issue – i.e., its failure to advise that the proposed constitutional amendment would raise the existing constitutionally-mandated judicial retirement age by 5 years – may not be cured through the advertising or publication outside the voting booth of the text of the proposed constitutional amendment or the plain English statement. (*Id.* at ¶ 75).

On August 16, 2016, the Secretary filed in the Pennsylvania Supreme Court a Cross Application for Summary Relief as well as a merits brief, to which Plaintiffs replied on August 18, 2016. (Doc. 17, ¶ 77).

On September 2, 2016, Pennsylvania Supreme Court Justice Todd filed an Opinion in Support of Granting Plaintiffs' Application for Summary Relief and Denying Defendant's Application for Summary Relief in which Justice Dougherty joined and Justice Wecht joined in part. (Doc. 17, ¶ 79; Doc. 17, Ex. Y). Justice Wecht filed a separate Opinion in Support of Granting Plaintiffs' Application for Summary Relief and Denying Defendant's Application for Summary Relief. (*Id.* at Ex. BB). Justice Baer filed an Opinion in Support of Denying Plaintiffs' Application for Summary Relief and Granting Defendant's Application for Summary Relief in which Justices Donohue and Mundy joined. (*Id.* at ¶ 80; *id.* at Ex. Z).

Accordingly, because Chief Justice Saylor did not participate in the consideration or decision of the matter, the Pennsylvania Supreme Court deadlocked on the question of

whether the Secretary's ballot question was unlawfully misleading. The Court thus entered

the following *per curiam* Order:

> **AND NOW,** this 2nd day of September, 2016, the Court being equally divided
> in its determination as to which parties are entitled to the grant of summary
> relief, this Court is without authority to grant relief and the *status quo* of the
> matter prior to the filing of the lawsuit is maintained. See Creamer v. Twelve
> Common Pleas Judges, 281 A.2d 57 (Pa. 1971) (holding that where this
> Court was evenly divided in a King's Bench original jurisdiction matter
> challenging gubernatorial appointments to judicial vacancies, the appropriate
> disposition was to enter a *per curiam* order noting that the requested relief
> could not be granted, thereby maintaining the *status quo* of the matter).

(Doc. 17, ¶ 81; Doc. 17, Ex. AA).

A few hours after the Pennsylvania Supreme Court issued its September 2, 2016

Order, the Plaintiffs filed an Application for Reconsideration requesting that the

Pennsylvania Supreme Court amend its Order to clarify that the case shall remain pending

in the Commonwealth Court in order to maintain the *status quo* of the lawsuit before the

Supreme Court exercised extraordinary jurisdiction over it. (Doc. 17, ¶ 91). The Secretary

opposed Plaintiffs' Application for Reconsideration and Correction on September 8, 2016.

(*Id.* at ¶ 92).

On September 16, 2016, the Pennsylvania Supreme Court entered an Order denying

Plaintiffs' Application for Reconsideration and Correction. (*Id.* at ¶ 93). Justice Todd, joined

by Justice Wecht, filed a dissenting statement in support of granting Plaintiffs' Application

for Reconsideration and remanding the case to the Commonwealth Court "for an expedited

resolution." (Doc. 17, ¶ 94).

17

On September 19, 2016, Plaintiffs filed in the Commonwealth Court of Pennsylvania a Petition for Review in the Nature of a Complaint seeking a declaration that the Secretary's ballot question was unlawfully misleading and requesting an order precluding the Secretary from placing the ballot question on the November 2016 general election ballot. (Doc. 17, ¶ 96). Plaintiffs and the Secretary thereafter filed competing applications for summary relief and supporting briefs. (Id. at ¶ 97).

On October 8, 2016, the Honorable Mary Hannah Leavitt, President Judge of the Commonwealth Court of Pennsylvania, issued a single-Judge Opinion granting the Secretary's Application for Summary Relief, denying Plaintiffs' Cross-Application for Summary Relief, and holding that under the doctrine of res judicata, the Pennsylvania Supreme Court's September 2, 2016 Order precluded the Commonwealth Court from ruling on Plaintiffs' Petition for Review. (Id. at ¶ 98).

On October 11, 2016, Plaintiffs appealed Judge Leavitt's Opinion and Order to the Pennsylvania Supreme Court by way of a Notice of Appeal, arguing that Judge Leavitt erred in holding that the doctrine of res judicata relieved the Commonwealth Court of its duty to rule on the merits of Plaintiffs' Petition for Review where no court had rendered a final adjudication with respect to the merits of Plaintiffs' challenge to the Secretary's ballot question. (Doc. 17, ¶ 99). In conjunction with their Notice of Appeal, Plaintiffs filed an Application to Expedite. (Id. at ¶ 100). The Secretary filed an Answer to Plaintiffs'

Application to Expedite, arguing that Judge Leavitt's Opinion and Order should be affirmed.

(*Id*. at ¶ 101).

On October 25, 2016, the Pennsylvania Supreme Court deadlocked and entered the

following Order:

> **AND NOW,** this 25th day of October, 2016, Appellants' emergency
> application to expedite disposition of this matter is **GRANTED**. Appellants'
> application for leave to file a reply to answer is **GRANTED**. The Court being
> equally divided, the Order of the Commonwealth Court is **AFFIRMED**.

(Doc. 17, ¶ 102; Doc. 17, Ex. II).  The State Supreme Court, in deadlocking, ruled as

follows: Chief Justice Saylor did not participate in the consideration or decision of the

matter; Justice Baer filed an opinion in support of affirmance in which Justices Donohue and

Mundy joined; Justice Todd filed an opinion in support of reversal in which Justices

Dougherty and Wecht joined; Justice Dougherty filed an opinion in support of reversal in

which Justices Todd and Wecht joined; Justice Wecht files an opinion in support of reversal

in which Justices Todd and Dougherty joined.  (Doc. 17, Ex. II).

On October 27, 2016, Plaintiffs filed the present action in federal court.  Plaintiffs

characterize this civil action as one "for declaratory and injunctive relief arising under 42

U.S.C. § 1983, the Constitution and laws of the United States, and the laws of the

Commonwealth of Pennsylvania" and assert that this Court has jurisdiction over this action

pursuant to 28 U.S.C. §§ 1331 and 1343 as well as jurisdiction over Plaintiffs' state law

claims pursuant to 28 U.S.C. § 1367.  (Doc. 17, ¶ 7).

In light of the aforementioned procedural history and factual allegations set forth in the Second Amended Complaint, Plaintiffs allege that the Secretary's ballot question is "misleadingly designed to garner 'yes' votes from voters who are unaware that there is currently a judicial retirement age set forth in the Pennsylvania Constitution but who are in favor of a mandatory judicial retirement age" and that "[t]he effectiveness of the Secretary's deceitful tactic is plain . . . which will violate Plaintiffs' due process rights and dilute and debase Plaintiffs' votes while also causing there to be judges on Pennsylvania state court benches whose tenures were not approved through a valid constitutional vote." (Doc. 117, ¶¶ 118, 120). In other words, according to Plaintiffs, "voters will be intentionally misled by the ballot question into voting contrary to their intentions, and the election results will not reflect the Pennsylvania voters' true will." (*Id.* at ¶ 121).

### III. STANDARD OF REVIEW

### A. Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1)

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) (internal citations omitted).

> [T]he federal courts are without power to adjudicate the substantive claims in a lawsuit, absent a firm bedrock of jurisdiction. When the foundation of federal authority is, in a particular instance, open to question, it is incumbent upon the courts to resolve such doubts, one way or the other, before proceeding to a disposition of the merits.

*Carlsberg Res. Corp. v. Cambria Sav. & Loan Ass'n*, 554 F.2d 1254, 1256 (3d Cir. 1977).

"Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868). This rule "'springs from the nature and limits of the judicial power of the United States' and 'is inflexible and without exception.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (quoting *Mansfield, C. & L. M. Ry. Co. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L. Ed. 462 (1884)). Moreover, "the burden of establishing the [existence of subject-matter jurisdiction] rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (internal citations omitted). This is because, since the federal courts' jurisdiction is strictly limited by Constitution and statute, "[i]t is to be presumed that a cause lies outside this limited jurisdiction." *Id.*

A motion to dismiss for lack of subject-matter jurisdiction is properly made under Federal Rule of Civil Procedure 12(b)(1). When a motion under Federal Rule of Civil Procedure 12 is based on several grounds, a court should first consider a 12(b)(1) challenge because if it must dismiss the complaint for lack of subject matter jurisdiction, "all other defenses and objections become moot." *In re Corestates Trust Fee Litig.,* 837 F.Supp. 104, 105 (E.D.Pa. 1993), *aff'd* 39 F.3d 61 (3d Cir. 1994).

"A district court has to first determine, however, whether a Rule 12(b)(1) motion

presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction

determines how the pleading must be reviewed." *Constitution Party of Pa. v. Aichele*, 757

F.3d 347, 357 (3d Cir. 2014).

> A facial attack, as the adjective indicates, is an argument that considers a
> claim on its face and asserts that it is insufficient to invoke the subject matter
> jurisdiction of the court because, for example, it does not present a question
> of federal law, or because there is no indication of a diversity of citizenship
> among the parties, or because some other jurisdictional defect is present.
> Such an attack can occur before the moving party has filed an answer or
> otherwise contested the factual allegations of the complaint. A factual attack,
> on the other hand, is an argument that there is no subject matter jurisdiction
> because the facts of the case – and here the District Court may look beyond
> the pleadings to ascertain the facts – do not support the asserted jurisdiction.

*Id.* at 358.

Thus, a Rule 12(b)(1) factual evaluation "may occur at any stage of the proceedings,

from the time the answer has been served until after the trial has been completed."

*Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891-892 (3d Cir. 1977).

However, "[a] factual jurisdictional proceeding cannot occur until plaintiff's allegations have

been controverted." *Id*. at 892 n.17. When a party files a motion attacking jurisdiction prior

to filing an answer to the complaint or otherwise presenting competing facts, the motion is

"by definition, a facial attack." *Aichele,* 757 F.3d at 358.

### B. Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6)

A complaint must be dismissed under Federal Rule Civil Procedure 12(b)(6), if it

does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The plaintiff

must aver "factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct.

1937, 1949, 173 L.Ed.2d 868 (2009).

     "Though a complaint 'does not need detailed factual allegations, . . . a formulaic

recitation of the elements of a cause of action will not do.'" *DelRio-Mocci v. Connolly Prop.

Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555). In other words,

"[f]actual allegations must be enough to raise a right to relief above the speculative level."

*Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013)

(internal citations and quotation marks omitted). A court "take[s] as true all the factual

allegations in the Complaint and the reasonable inferences that can be drawn from those

facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v.

Abbott Labs.*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation marks

omitted).

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to
> determine the sufficiency of a complaint: First, the court must take note of the
> elements a plaintiff must plead to state a claim. Second, the court should
> identify allegations that, because they are no more than conclusions, are not
> entitled to the assumption of truth. Finally, where there are well-pleaded
> factual allegations, a court should assume their veracity and then determine
> whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged - but it has not show[n] - that the

pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks

omitted). This "plausibility" determination will be a "context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Id.*

## IV. ANALYSIS

## A. Failure to Join Indispensable Parties

A party may move to dismiss a complaint pursuant to Fed. R. Civ. P. 12(b)(7) for

failure to join a party under Rule 19. Although Defendant raises Rule 12(b)(7) as one of the

bases for his motion to dismiss, he only addresses this argument in a footnote to his brief in

support of the motion. (*See* Doc. 20, at 3 n. 4). The Secretary's brief argument is as follows:

> The ballot question, as approved by voters, is now part of the Pennsylvania
> Constitution. . . . Therefore, all commissioned judges now have a significant
> vested interest in the Commonwealth's constitutionally mandated retirement age.
> This interest will be affected by a final decree in this litigation and those judges
> are therefore indispensable.

(*Id.*) (internal citation omitted). The Court interprets this statement as an assertion that

every Pennsylvania state court judge is an indispensable party and thus must be joined in

this action.

Pursuant to Rule 19:

> A person who is subject to service of process and whose joinder will not deprive
> the court of subject-matter jurisdiction must be joined as a party if: (A) in that
> person's absence, the court cannot accord complete relief among existing
> parties; or (B) that person claims an interest relating to the subject of the action

24

and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). However, "[i]f a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." *Id.* at 19(b).

The clauses set forth in Rule 19(a)(1)(A) and (B) should be considered in the disjunctive. *Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 313 (3d Cir. 2007).

In determining whether Rule 19(a)(1)(A) has been satisfied and therefore that in the person's absence, "complete relief among the existing parties" can be granted, "[t]he effect that a decision may have on an absent party is immaterial." *Huber v. Taylor*, 532 F.3d 237, 248 (3d Cir. 2008). Here, the form of relief sought by Plaintiffs is a declaration that the Secretary's ballot question regarding the proposal to amend the Pennsylvania Constitution to raise the constitutionally mandated judicial retirement age from 70 to 75 violates Pennsylvania law and the United States Constitution and that any vote cast upon the Secretary's ballot question is invalid under state and federal law. Plaintiffs thus seek an injunction either invalidating the results of the election on the Secretary's ballot question or precluding the Secretary from tallying and certifying votes cast in the November 8, 2016 general election on the ballot question at issue in this case. (Doc. 17, at 49-50). The Court could grant the entirety of this relief to Plaintiffs and the Secretary does not argue otherwise. Despite any concerns the Secretary may have regarding the impact of this complete relief,

the effect on the purportedly indispensable state court judges is irrelevant to this first determination.  Thus, the requirement set forth in Rule 19(a)(1)(A) is met.

The Secretary is equally unable to prevail under Rule 19(a)(1)(B).  Although Defendant argues that "all commissioned judges have a significant vested interest in the Commonwealth's constitutionally mandated retirement age" (Doc. 20, at 3 n.4), Defendant mischaracterizes the nature of the interest at issue here.  The interest raised by Plaintiffs is the right to participate in a fundamentally fair state and local election.  The aftermath or results of the election do not form the basis for the interest in this case.  Simply because state court judges may have an interest in the result of the election because of its impact on their employment does not confer on them a special interest in the outcome of Plaintiffs' particular action.  Rather, the interest of a state court judge here is the exact same as that of any Pennsylvania voter – the right to a fundamentally fair election, including ballot language that is not unconstitutionally misleading.

"[A] holding that joinder is compulsory under Rule 19(a) is a necessary predicate to a district court's discretionary determination under Rule 19(b) that it must dismiss a case because joinder is not feasible (i.e., will defeat diversity) and the party is indispensable to the just resolution of the controversy." *Gen. Refractories Co.,* 500 F.3d at 313.

Because it is necessary to establish the elements of both Rule 19(a) and 19(b) when determining indispensability, a party can only be found to be indispensable when: "(1) the party is a required party under Rule 19(a); (2) the party cannot be joined; and (3) the court

determines that the action cannot proceed in that party's absence." 1 Moore's Federal Rules Pamphlet § 19.3[2] (Matthew Bender).

Although the Secretary only broadly cites to Rule 19 for purposes of his joinder argument, and his brief assertions fail to fully inform the Court of the nature of his argument, his analysis appears to entirely overlook Rule 19(a) and impermissibly rely solely on Rule 19(b).[4] Given the issue of the constitutionality of the ballot language, every member of the state judiciary cannot be said to be indispensable parties to the present action. As discussed, the state court judges are not required parties under Rule 19(a). Furthermore, Defendant offers no reason why joinder would not be feasible if the judges were required parties. Accordingly, a Rule 19(b) analysis is unnecessary and Defendant's motion to dismiss based on Rule 12(b)(7) will be denied.

## B. The *Rooker-Feldman* Doctrine

The Court will next address Defendant's argument that he "is entitled to have this case dismissed because the Court lacks jurisdiction to hear Plaintiffs' suit under the *Rooker-Feldman* doctrine" (Doc. 20, at 18).

---

[4] *Compare* Doc. 20, at 3 n.4

([A]ll commissioned judges now have a significant vested interest in the Commonwealth's constitutionally mandated retirement age. This interest will be affected by a final decree in this litigation and those judges are therefore indispensable. Fed. R. Civ. P. 19; *See Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1011 (3d Cir. 1987) (parties are indispensable where "a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience.")).

*with* Fed. R. Civ. P. 19(b) ("If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. . . . ").

*Rooker-Feldman* prevents federal district courts from exercising jurisdiction "[i]n certain circumstances, where a federal suit follows a state suit." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 163-64 (3d Cir. 2010). The doctrine originated from two Supreme Court opinions issued over the course of six decades, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). "The doctrine is derived from 28 U.S.C. § 1257 which states that '[f]inal judgments or decrees rendered by the highest court of a state in which a decision could be had, may be reviewed by the Supreme Court.'" *Gary v. Braddock Cemetery*, 517 F.3d 195, 200 (3d Cir. 2008). "'Since Congress has never conferred a similar power of review on the United States District Courts, the Supreme Court has inferred that Congress did not intend to empower District Courts to review state court decisions.'" *Id.* (quoting *Desi's Pizza, Inc. v. City of Wilkes Barre*, 321 F.3d 411, 419 (3d Cir. 2003)). Thus, *Rooker* and *Feldman* "exhibit the limited circumstances in which this Court's appellate jurisdiction over state-court judgments, 28 U.S.C. § 1257, precludes a United States district court from exercising subject-matter jurisdiction in an action it would otherwise be empowered to adjudicate under a congressional grant of authority," such as 28 U.S.C. § 1331. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005).

The narrow scope of *Rooker-Feldman* is "confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries

caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil*, 544 U.S. at 284. The doctrine is not implicated "simply because a party attempts to litigate in federal court a matter previously litigated in state court" and therefore "[i]f a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'" *Id.* at 293 (quoting *GASH Assoc. v. Vill. of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)). The jurisdictional bar imposed by *Rooker-Feldman* is not so expansive as to include federal actions "that simply raise claims previously litigated in state court." *Exxon Mobil*, 544 U.S. at 287 n.2. *See also*, *Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d 542, 547 (3d Cir. 2006) ("Turner's action in the district court did not complain of injuries caused by the state court judgment. Rather, Turner's complaint raised federal claims, grounded on the FHA [Fair Housing Act], *not* caused by the state-court judgment but instead attributable to defendants' alleged FHA violations that preceded the state-court judgment. . . . Though Turner's district court complaint undoubtedly overlaps her adjudicated state-court claims, and is based on the same operative facts, this overlap does not mean that the *Rooker-Feldman* doctrine is applicable here. As the Court explained in *Exxon Mobil,* a district court is not divested of subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court.") (internal citations omitted).

In the Third Circuit,

there are four requirements that must be met for the *Rooker-Feldman* doctrine to apply: (1) the federal plaintiff lost in state court; (2) the plaintiff "complain[s] of injuries caused by [the] state-court judgments"; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments.

*Great W. Mining & Mineral Co.*, 615 F.3d at 166 (alteration in original) (quoting *Exxon Mobil*, 544 U.S. at 284). According to the Court of Appeals, "[t]he second and fourth requirements are the key to determining whether a federal suit presents an independent, non-barred claim." *Id*.

"The second requirement - that a plaintiff must be complaining of injuries caused by a state-court judgment - may also be thought of as an inquiry into the source of the plaintiff's injury." *Id*. In other words, "when the source of the injury is the defendant's actions (and not the state court judgments), the federal suit is independent, even if it asks the federal court to deny a legal conclusion reached by the state court." *Id*. at 167. As a result, the federal court's task is "to identify those federal suits that profess to complain of injury by a third party, but actually complain of injury 'produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it.'" *Id*. (quoting *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 88 (2d Cir. 2005)). In deciding whether a federal plaintiff is asserting an injury caused by the defendant's actions, as opposed to a state court judgment, a federal court should also look at the timing of the injury, "that is, whether the injury complained of in federal court existed prior to the state-court proceedings and thus

could not have been 'caused by' those proceedings." *Great W. Mining & Mineral Co.*, 615 F.3d at 167.

The fourth requirement necessary for establishing the application of *Rooker-Feldman* – that the plaintiff must invite review and rejection of the state-court judgment – is closely related to the second requirement and "targets [ ] whether the plaintiff's claims will require appellate review of state-court decisions by the district court." *Id.* at 168-169.

Turning to the case at hand, only the third requirement set forth in *Great Western Mining* appears to undisputedly have been met in that all related state court judgments were rendered before the federal suit was filed.

With respect to the other factors, as previously noted, the doctrine of *Rooker-Feldman* is not implicated "simply because a party attempts to litigate in federal court a matter previously litigated in state court" and thus "[i]f a federal plaintiff present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party", then there is jurisdiction. *Exxon Mobil*, 544 U.S. at 293. Here, Plaintiffs argue in their brief opposing Defendant's Motion to Dismiss that they have presented an independent claim, to wit, the deprivation of "a due process right under the United States Constitution to participate in state and local elections that afford 'fundamental fairness'", (Doc. 31, at 4-5) (citing *Griffin v. Burns*, 570 F.2d 1065, 1078 (1st Cir. 1978) (citing *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 163, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)).

Plaintiffs also cite to the statement of the Third Circuit in *Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994), where, in holding that the District Court did not err in refusing to abstain as to a suit claiming election fraud in the casting of absentee ballots while an appeal as to the same matter was pending in the Supreme Court of Pennsylvania, stated:

> Where there is substantial wrongdoing in an election, the effects of which are not capable of quantification but which render the apparent result an unreliable indicium of the will of the electorate, courts have frequently declined to allow the apparent winner to exercise the delegated power.

19 F.3d at 887.

Suit was brought in *Marks* pursuant to the Voting Rights Act of 1965, 42 U.S.C. § 1973, *et seq.*, the Civil Rights Act of 1964, 42 U.S.C. § 2000a, *et seq.*, statutes which do not appear to form the basis for Plaintiffs' Complaint here. However, in *Burton v. Georgia*, the plaintiffs brought suit pursuant to 42 U.S.C. § 1983, asserting that the ballot language for a proposed amendment to the State's constitution "so misled voters that it violated their right to vote, guaranteed by the federal constitution's Due Process Clause." 953 F.2d 1266, 1267 (11th Cir. 1992). While recognizing that "not every state election dispute implicates federal constitutional rights," that "[o]nly in extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation," and that "isolated events that adversely affect individuals are not presumed to be a constitutional violation," the Court set forth the following standard for determining whether the ballot language adopted by the state may give rise to a violation of the Fourteenth Amendment's Due Process Clause: "For such extraordinary relief to be justified, it must be demonstrated that the state's choice of

ballot language so upset the evenhandedness of the referendum that it worked a patent and

fundamental unfairness on the voters." *Id.* at 1268-1269 (internal citations and quotation

marks omitted).

> The Court further determined that:

> As long as citizens are afforded reasonable opportunity to examine the full text of the proposed amendment, broad-gauged unfairness is avoided if the ballot language identifies for the voter the amendment to be voted upon. Therefore, substantive due process requires no more than that the voter not be deceived about what amendment is at issue.

*Id.* at 1269. The Court added that "[w]hen the ballot language purports to identify the

proposed amendment by briefly summarizing its text, then substantive due process is

satisfied – and the election is not 'patently and fundamentally unfair' – so long as the

summary does not so plainly mislead voters about the text of the amendment that 'they do

not know what they are voting for or against'; that is, they do not know which or what

amendment is before them." *Id.* at 1270.

The Due Process Clause of the Fourteenth Amendment also provided federal

jurisdiction for a challenge brought by voters in North Carolina seeking a validation of a

state constitutional amendment which authorized local government to issue bonds for

development projects without first receiving voter approval by referendum. In *Bishop v.

Bartlett*, 575 F.3d 419 (4th Cir. 2009), the plaintiffs alleged that the process by which the

amendment was placed before the voters was misleading and violated their due process

rights. Although the Court of Appeals affirmed the District Court's ruling that the voters

lacked the requisite injury-in-fact and causation required for standing, the Circuit nonetheless acknowledged that "[i]t is without dispute that the right to vote is 'the most basic of political rights,' such that the government's interference with that right may satisfy the injury-in-fact requirement." *Id.* at 424 (quoting *FEC v. Akins*, 524 U.S. 11, 25, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998)).

Here, Plaintiffs have alleged, *inter alia*, that the Secretary's ballot question was "misleadingly designed to garner 'yes' votes" from voters who favored a mandatory judicial age retirement but who were unaware that there was a judicial retirement age already incorporated in the Pennsylvania Constitution such that these voters were deceived into voting yes for the amendment to the Constitution on the mistaken belief that they were setting, rather than increasing, the judicial retirement age. Plaintiffs argue that the language of the ballot as established by the Secretary violates the Plaintiffs' "due process rights and dilute[s] and debase[s] Plaintiffs' vote while also causing there to be judges on Pennsylvania state court benches whose tenures were not approved through a valid constitutional vote." (Doc. 17, ¶¶ 118, 120).

Thus, Plaintiffs present an independent claim based solely on the Fourteenth Amendment's Due Process Clause and the *Rooker-Feldman* doctrine as explicated in *Exxon Mobil, supra,* and *Great Western Mining, supra*, is not a complete bar to Plaintiffs' claims in federal court.

The Secretary argues that "[i]n order for this Court to find a due process violation, it must in effect overturn the decision of the Pennsylvania Supreme Court, making the federal claim inextricably intertwined with the state court adjudication." (Doc. 20, at 20). The phrase "'inextricably intertwined' has no independent content [and i]t is simply a descriptive label attached to claims that meet the requirements outline in *Exxon Mobil*." *Hoblock*, 422 F.3d at 87. As explained in *Exxon Mobil* and *Great Western Mining*, *Rooker-Feldman* requires that a plaintiff must be complaining of injuries caused by a state-court judgment. This "may also be thought of as an inquiry into the source of the plaintiff's injury" i.e. "when the source of the injury is the defendant's actions (and not the state court judgments), the federal suit is independent, even if it asks the federal court to deny a legal conclusion reached by the state court." *Great W. Mining & Mineral Co.*, 615 F.3d at 166, 167. Here, Plaintiffs are not complaining of a state court injury, but rather the actions of the Secretary in placing an allegedly unconstitutional question on the ballot. This renders *Rooker-Feldman* inapplicable in the present action. Addressing Plaintiffs' federal constitutional claim could not "overturn" the Pennsylvania Supreme Court's decision where it is not the state courts' decisions that Plaintiffs take issue with. Despite Defendant's arguments, "[t]he fact that the state court chose not to remedy the injury does not transform the subsequent federal suit on the same matter into an appeal, forbidden by *Rooker-Feldman*, of the state-court judgment." *Hoblock*, 422 F.3d at 88; *see also, id.* ("[A] federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's

actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left

unpunished by it.").[5]

Further, regardless of whether *Rooker-Feldman* bars the claims brought by Castille,

Zappala, and Sprague, it does not operate as a bar to those of Herron and Levinson.  The

Secretary, citing to his discussion of privity in the collateral estoppel section of his brief in

support of the motion to dismiss, broadly asserts that "[b]ecause both sets of Plaintiffs are in

privity with one another, Plaintiffs are all state court losers." (Doc. 20, at 19 n. 9).

Defendant conflates the requirements of *Rooker-Feldman* and collateral estoppel.  The

Supreme Court has made clear that

> [w]hatever the impact of privity principles on preclusion rules, *Rooker-Feldman* is not simply preclusion by another name. The doctrine applies only in "limited circumstances," *Exxon Mobil, supra,* at 291, 125 S.Ct. 1517, where a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court. The *Rooker-Feldman* doctrine does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment.

*Lance v. Dennis,* 546 U.S. 459, 466, 126 S.Ct. 1198, 163 L.Ed.2d 1059 (2006).  As a result,

*Rooker-Feldman* has no impact on the claims of Levinson and Herron.

This determination that an independent federal claim exists allows this Court to

proceed to the next step in its analysis - a determination of whether Plaintiffs' claims in this

action deny a legal conclusion reached in the state court proceedings and, if so, whether the

---

[5] Although this Court finds that *Rooker-Feldman* does not apply to bar Plaintiffs' claim, this does not preclude our finding, *infra,* that Sprague, Castille, and Zappala, are barred by the doctrine of res judicata.

Defendant prevails under principles of res judicata (claim preclusion) or collateral estoppel

(issue preclusion).

## C. The Preclusion Doctrines

The Secretary argues that "Res Judicata bars this action as to Sprague, Castille and

Zappala" and that "Collateral Estoppel bars the remaining claims." (Doc. 20, at 12-18).

Therefore, having found that this Court does not lack subject-matter jurisdiction

under *Rooker-Feldman*, the Court turns to the separate issue of whether Plaintiffs are

precluded by res judicata or collateral estoppel.

> [S]hould the *Rooker-Feldman* doctrine not apply such that the district court
> has jurisdiction, "[d]isposition of the federal action, once the state-court
> adjudication is complete, would be governed by preclusion law." *Exxon
> Mobil,* 544 U.S. at 293, 125 S.Ct. 1517. In other words, the federal court
> must "'give the same preclusive effect to a state-court judgment as another
> court of that State would give.'" *Id.* (quoting *Parsons Steel, Inc. v. First Ala.
> Bank,* 474 U.S. 518, 523, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986)) (further
> citation omitted). As *Exxon Mobil* makes clear, the *Rooker-Feldman* inquiry is
> distinct from the question of whether claim preclusion (res judicata) or issue
> preclusion (collateral estoppel) defeats the federal suit.

*Great W. Mining & Mineral Co.*, 615 F.3d at 170. *See also, Lance,* 546 U.S. at 466

("*Rooker-Feldman* is not simply preclusion by another name." Because "Congress has

directed federal courts to look principally to *state* law in deciding what effect to give state-

court judgments [, i]ncorporation of preclusion principles into *Rooker-Feldman* risks turning

that limited doctrine into a uniform *federal* rule governing the preclusive effect of state-court

judgments, contrary to the Full Faith and Credit Act.") (italics in original).

Upon determining that *Rooker-Feldman* does not apply and the federal court has

jurisdiction, "state law determines whether the defendant prevails under principles of

preclusion." *Exxon Mobil*, 544 U.S. at 29. Because Pennsylvania law is "not inconsistent"

with federal decisions on res judicata, collateral estoppel, and privity, Third Circuit precedent

is considered persuasive in addressing questions of preclusion arising under Pennsylvania

law. *Nat'l Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 310 (3d Cir. 2009).

### 1. Res Judicata/Claim Preclusion

The United States Supreme Court has explained that

the doctrine of *res judicata* provides that when a final judgment has been
entered on the merits of a case, it is a finality as to the claim or demand in
controversy, concluding parties and those in privity with them, not only as to
every matter which was offered and received to sustain or defeat the claim or
demand, but as to any other admissible matter which might have been offered
for that purpose. The final judgment puts an end to the cause of action, which
cannot again be brought into litigation between the parties upon any ground
whatever.

*Nevada v. U.S.*, 463 U.S. 110, 129-130, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983) (internal

quotation marks and citations omitted). As the Pennsylvania Supreme Court has reiterated,

"[r]es judicata, or claim preclusion, is a doctrine by which a former adjudication bars a later

action on all or part of the claim which was the subject of the first action. Any final, valid

judgment on the merits by a court of competent jurisdiction precludes any future suit

between the parties or their privies on the same cause of action." *Balent v. City of Wilkes-*

*Barre*, 669 A.2d 309, 313 (Pa. 1995); *see also, Graboff v. Am. Ass'n of Orthopaedic*

*Surgeons*, 559 F.App'x 191, 194 (3d Cir. 2014). "Res judicata applies not only to claims

actually litigated, but also to claims which could have been litigated during the first

proceeding if they were part of the same cause of action." *Balent*, 669 A.2d at 313.

Pennsylvania law requires "a concurrence of four conditions" in order to prevail on a

claim of res judicata. *In re Iulo*, 766 A.2d 335, 337 (Pa. 2001). Specifically, Pennsylvania

state courts have found that the "[a]pplication of the doctrine of res judicata as an absolute

bar to a subsequent action requires that the two actions possess the following common

elements: (1) identity of the thing sued upon; (2) identity of the cause of action; (3) identity

of the parties; (4) identity of the capacity of the parties." *Stoeckinger v. Presidential Fin.*

*Corp. of Delaware Valley*, 948 A.2d 828, 832 (Pa. Super. Ct. 2008) (quoting *Dempsey v.*

*Cessna Aircraft Co.*, 653 A.2d 679, 681 (Pa. Super. Ct. 1995)).

Applying the four elements outlined by Pennsylvania courts, this Court must find that

the state law claim of Plaintiffs Castille, Zappala, and Sprague is barred by res judicata.

The first element – identity of the thing sued upon, i.e. of the subject matter –

requires that the "same occurrence underlies both suits." *Gregory v. Chehi*, 843 F.2d 116-

117 (3d Cir. 1988). Here, there can be no question that the events giving rise to the action

in state court are identical to those in federal court. The facts underlying both cases are

identical and are based on the same ballot question and the placement of that question on

the November 8, 2016 ballot. Therefore, the first element is satisfied.

A Court can determine whether the second element – identity of the causes of action

– has been met

39

by considering the similarity in the acts complained of and the demand for recovery as well as the identity of the witnesses, documents and facts alleged. In determining whether res judicata should apply, a court may consider whether the factual allegations of both actions are the same, whether the same evidence is necessary to prove each action and whether both actions seek compensation for the same damages.

*Dempsey*, 653 A.2d at 681 (internal citations and quotation marks omitted). A Court's "primary focus" when determining the identity of the causes of action "should be whether the ultimate and controlling issues have been decided." *Id*. at 681 (collecting cases). Here, as previously stated, the causes of action in state court and federal court are predicated on the same factual allegations. The acts complained of by Plaintiffs are not only "similar", they are the same and the demand for recovery is identical: a declaration that the ballot language is unlawful. As such, the second element of res judicata has been met.

The third element – identity of the parties – yields relief for Plaintiffs Levinson and Herron. Only Zappala, Castille, Sprague, and the Secretary, were parties to the state court actions. Although Defendant makes the argument that Plaintiffs Herron and Levinson are barred by the doctrine of collateral estoppel because they are in privity with Plaintiffs Castille, Zappala, and Sprague, the Secretary does not make this argument with respect to whether Herron and Levinson are in privity with the state court plaintiffs for purposes of preclusion under res judicata. Rather, Defendant specifically argues that "Res Judicata bars this action as to Sprague, Castille and Zappala." (Doc. 20, at 12). Therefore, although privity is a requirement for determining whether a non-party to a prior action may still be barred by the doctrine of res judicata, the Court deems Defendant's specific statement that

40

only the original three plaintiffs are barred by res judicata as an admission that this doctrine is not a bar to Herron and Levinson and a waiver of any argument to the contrary. As such, none of the claims brought by Plaintiffs Herron and Levinson are barred under the doctrine of res judicata and the state and federal claims survive as to these two plaintiffs.

The final element in determining whether res judicata applies is whether the parties in the current action are suing, or being sued, in the same capacity as in the prior action. A review of the Second Amended Complaint (Doc. 17) and the original plaintiffs' "Emergency Application for Extraordinary Relief Pursuant to 42 Pa.C.S. § 726 for the Exercise of Extraordinary Jurisdiction"" (Doc. 17, Ex. O) attached to the Second Amended Complaint reveals that Castille, Zappala, and Sprague are now suing the Secretary in the exact same capacities as before and no party argues otherwise.

The U.S. Supreme Court has made clear that "the Full Faith and Credit Act requires that federal courts give the state-court judgment, and particularly the state court's resolution of the res judicata issue, the same preclusive effect it would have had in another court of the same State." *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 526, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986). Due to the October 25, 2016, deadlock by the Pennsylvania Supreme Court, the Commonwealth Court's finding that the first case was decided by the state's highest court on the merits constitutes the controlling decision on the matter. Regardless of whether this Court agrees with Judge Leavitt's holding that the state law claims previously

brought in the Commonwealth Court are, in fact, res judicata, this Court is bound by her findings.

Judge Leavitt's opinion found that the action before her "[was] brought by the exact same Petitioners as in *Sprague I*; raise[d] the exact same issues as in *Sprague I*; and assert[ed] the exact same cause of action, namely whether the question for the ballot is constitutionally defective." (Doc. 17, Ex. HH, at Ex. A at 6-7). Count III of Plaintiffs' Second Amended Complaint sets forth the following claim:

> The Secretary's ballot question regarding the proposed amendment to Article V, Section 16(b) of the Pennsylvania Constitution is so misleading and non-reflective of the proposed amendment that if the Secretary is permitted to tally and certify votes cast upon it in the November 2016 general election, Plaintiffs and their fellow citizens comprising the qualified electors of the Commonwealth of Pennsylvania will be effectively stripped of their right guaranteed by Article XI, Section 1 of the Pennsylvania Constitution to approve the proposed amendment to the Pennsylvania Constitution.

(Doc. 17, ¶ 141). This statement in effect challenges the state constitutionality of the ballot question and therefore raises the exact claim that the state court has already found to be res judicata.

As a result of the above-analysis, we must find that the state law claim (Count III) brought by Plaintiffs Castille, Zappala, and Sprague is barred by res judicata. Further, Plaintiffs' request in their prayer for relief in their Second Amended Complaint, requesting that this Court issue a "declaration that the Secretary's ballot question regarding the proposal to amend the Pennsylvania Constitution to raise the constitutionally-mandated judicial retirement age from 70 to 75 is unlawful under Pennsylvania law and that any vote

42

cast upon the Secretary's ballot question is invalid under Pennsylvania law." (Doc. 17, at 49) is also barred as to the three original plaintiffs by res judicata.

The federal claims (Counts I and II) brought by Plaintiffs Castille, Zappala, and Sprague are equally barred by the doctrine of res judicata, although for a different reason. These Plaintiffs did not raise their federal constitutional claims in state court, despite being able to do so, thereby rendering those federal claims likewise barred by res judicata. *See Balent*, 669 A.2d at 313 ("Res judicata applies not only to claims actually litigated, but also to claims which could have been litigated during the first proceeding if they were part of the same cause of action."). Because, absent two narrow exceptions not applicable here, federal and state courts have concurrent jurisdiction over actions arising under § 1983, *Haywood v. Drown*, 556 U.S. 729, 735, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009), and thus Pennsylvania courts generally may entertain actions brought under § 1983, there is no reason Castille, Zappala, and Sprague could not have brought their federal claims in state court.

Plaintiffs admit that the federal claims were not before the Pennsylvania Supreme Court or Commonwealth Court, but seemingly argue that those claims did not need to be brought in state court because "Pennsylvania has no 'entire controversy' requirement providing that Plaintiffs were obligated to bring the federal claims in the state action." (Doc. 31, at 36). Plaintiffs' reasoning would lead to the anomalous result of requiring both Pennsylvania state courts and federal courts applying Pennsylvania law to consistently reject res judicata's requirement that a claim which could have been brought in a prior

43

action is barred simply because there is no "entire controversy" requirement in the state. As

the Third Circuit similarly noted:

> Turner argues, however, citing Pennsylvania Rule of Civil Procedure 1020,
> that res judicata does not bar this action because Pennsylvania has a
> permissive joinder rule that did not require her to join her FHA claims in the
> state court litigation. This argument confuses the separate concepts of waiver
> and res judicata. Even assuming that Turner was not required to raise her
> FHA claim under the procedural rules, she nonetheless could have done so.
> Pennsylvania courts, without citing or discussing compulsory joinder rules,
> consistently have held that the common law doctrine of res judicata
> bars "claims that were *or could have been raised* in the prior action." *See,
> e.g., Balent,* 669 A.2d at 315 (emphasis added).

*Turner,* 449 F.3d at 550 n. 13.

For the afore-discussed reasons, although the claims brought by Plaintiffs Herron

and Levinson are not barred under the doctrine of res judicata, those brought by Plaintiffs

Castille, Zappala, and Sprague, are so barred.

## 2. Collateral Estoppel/Issue Preclusion

Under the principles of collateral estoppel "once a court has decided an issue of fact

or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit

on a different cause of action involving a party to the first case." *Allen v. McCurry,* 449 U.S.

90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)(citing *Montana v. U.S.,* 440 U.S. 147, 153, 99

S.Ct. 970, 59 L.Ed.2d 210 (1979)).  A suit will be barred by the doctrine of collateral

estoppel under Pennsylvania law when "(1) the issue decided in the prior case [is] identical

to the one presented in the later case; (2) there was a final judgment on the merits in the

prior action; (3) [t]he party against whom collateral estoppel is asserted was a party to the

prior action, or is in privity with a party to the prior action; and (4) [t]he party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action." *Nat'l Mut. Fire Ins. Co.*, 571 F.3d at 310 (citing *Rue v. K-Mart Corp.,* 552 Pa. 13, 713 A.2d 82, 84 (1998)).

The Court first turns to an analysis of whether the federal claims of any of the plaintiffs are barred by issue preclusion. In *Hoblock v. Albany County Board of Elections*, two candidates and several voters filed a § 1983 action in the Northern District of New York District Court alleging that the county board of elections' refusal to tally absentee ballots violated the voters' Fourteenth Amendment rights. The candidates had previously petitioned the New York Supreme Court to have various absentee ballots invalidated. The state court later invalidated certain ballots, finding that they were issued in violation of a prior district court order and Article 8 of the New York Election Law. The Appellate Division and subsequently the New York Court of Appeals affirmed the lower court's decision, for the reasons relied on by the trial court. 422 F.3d at 82-83.

On appeal of the District Court's grant of a preliminary injunction which preliminarily enjoined the Board of Elections from certifying the election results without tallying the challenged absentee ballots, the Second Circuit found that the district court properly held that issue preclusion did not bar the voters' federal action. The Circuit explained that the issue in the federal action was "whether voters' federal constitutional rights are violated by the Board of Elections' refusal to count absentee ballots on the ground that those ballots,

although issued to voters by the Board of Elections, were invalid under state law." *Id*. at 94.

The Court then rejected the Board of Elections' argument that because several state court

judges' dissents referred to the voters' constitutional rights, that issue was decided, finding

that the Court should only look to the majority opinion.

> [T]o determine what issues were "actually and necessarily decided" by the
> New York Court of Appeals - and it is the preclusive effect of that decision
> alone that is in question - we look to the majority opinion. Where, as here,
> that opinion unambiguously relies on state law alone, we cannot say that the
> court decided federal constitutional questions just because a dissenting judge
> in the Court of Appeals (let alone dissenting judges in the Appellate Division)
> would have preferred that the case be decided differently on constitutional
> grounds. The New York Court of Appeals held that "the absentee ballots
> collected in violation of both a federal court order and article 8 of the [New
> York] Election Law are invalid ...." It explained further that "in New York, the
> right to vote by absentee ballot is purely a statutory right." Nowhere does the
> Court of Appeals discuss the voters' constitutional rights, and we therefore
> agree with the district court that "[t]he issue of whether the invalidation of the
> absentee ballots would violate the Fourteenth Amendment was not addressed
> by the Court of Appeals," and issue preclusion thus does not bar the voters
> from litigating this issue in federal court.

*Id*. (internal citations omitted).

A similar analysis applies to the case at bar. However, because there was no

majority, this Court looks to each opinion written by the Pennsylvania Supreme Court

justices on September 2, 2016. In ruling on Plaintiffs' first action, which the Commonwealth

Court found constituted a res judicata bar in the second state court action, the Pennsylvania

Supreme Court justices relied exclusively on state law in setting forth their positions

regarding the state constitutionality of the ballot measure. Further, their order, the only

binding issuance on this matter, relied on a state law mechanism which restored the case to

the *status quo*. Thus, with respect to the federal claims, in conformity with the Second

Circuit's analysis, when the state court's "opinion unambiguously relies on state law alone,

we cannot say that the court decided federal constitutional questions." Therefore, there is

no issue preclusion because no factual or legal issues were decided which impact or control

the federal claims and each of the September 2, 2016 and October 25, 2016 opinions rely

exclusively on state law as does the Commonwealth Court's opinion. Nonetheless,

because this Court has previously found that Plaintiffs Castille, Zappala, and Sprague are

barred by the doctrine of res judicata, *supra*, our finding that the federal claims are not

precluded is only applicable to Plaintiffs Herron and Levinson.

This Court next turns to the plaintiffs' state law claim. As discussed in the prior

section of this opinion, the state law claim of Castille, Zappala, and Sprague is barred by res

judicata. This leaves only Levinson and Herron's state law claim remaining. In determining

whether this claim is precluded, the Court looks to the Secretary's argument in support of

dismissing Plaintiffs' claim on the basis of issue preclusion.

Although the Secretary properly cites to the necessary factors to establish collateral

estoppel, he omits a key element from his analysis. Relying on his prior arguments in

support of why the original plaintiffs are barred by the doctrine of res judicata, Defendant

states that therefore "factors 1-3 and 5 [to establish collateral estoppel] are satisfied as to all

Plaintiffs." (*Id.* at 16).[6] However, the Secretary never addresses the fourth factor as to any plaintiff, specifically that "the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding." (*Id.*) (quoting *Folino v. Young*, 568 A.2d 171, 174 (Pa. 1990)). A review of the Secretary's brief in support of his motion to dismiss reveals that he never specifically addresses whether any plaintiff received a "full and fair opportunity" to litigate the issues. Although this Court has found that it is bound by the Commonwealth Court's finding that there was a final decision on the merits, this finding is distinguishable from a finding that Plaintiffs had a full and fair opportunity to litigate their action in state court, a separate issue not addressed by Judge Leavitt. The complete absence of any discussion on this point, in conjunction with the Secretary's specific statement that factors 1-3 and 5 are met, leads this Court to find that the Secretary is implicitly acknowledging that the fourth factor may not have been met as to any plaintiff.[7] As a result, the Secretary has not established that the state law claim of the original plaintiffs would be barred by issue preclusion; thus the state law claim of Plaintiffs Levinson and Herron can necessarily not be barred by issue preclusion.

---

[6] This Court cited a different case than the defendant for the factors necessary to establish issue preclusion. Although this Court's citation only contained four factors, and defendant's case contained five factors, a review of these factors demonstrates that they are identical in all material respects. *Compare Nat'l Mut. Fire Ins. Co.*, 571 F.3d at 310, *with Folino*, 568 A.2d at 174.

[7] The Court is at a loss to understand the Secretary's failure to address this fourth criterion since this Court is of the view that it would not be difficult to argue that the original plaintiffs were afforded a full and fair opportunity to litigate the issue in state court. However, it goes without saying that it is not the role of the Court to construct arguments for any litigant, particularly where, as here, the argument would address a well-established criterion, of which Defendant was well-aware, on the matter of issue preclusion.

Although Defendant argues that Plaintiffs Herron and Levinson are in privity with the other plaintiffs, and therefore barred by the doctrine of collateral estoppel (Doc. 20, at 17-18), because this Court finds that only res judicata bars the federal and state claims of Castille, Zappala, and Sprague, and that collateral estoppel would not operate to bar the claims of any Plaintiff, we need not address this argument. *See Hoblock*, 422 F.3d at 94-95 ("Because our finding that the voters' constitutional rights were not at issue in the state-court litigation disposes of the issue-preclusion question, we can resolve that question without deciding whether the voters were (actually or constructively) parties to that litigation.).

## D. Standing of Plaintiffs

The Secretary also argues that he is entitled to have this action dismissed because the plaintiffs lack standing to bring this action. (Doc. 20, at 6-8). Because this Court has already found that the claims of Plaintiffs Castille, Zappala, and Sprague are barred in their entirety by the doctrine of res judicata, we will focus the standing analysis on the remaining Plaintiffs, Herron and Levinson.[8]

"The question of standing 'involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). It is well settled that three elements must be satisfied to meet "the irreducible constitutional minimum of standing": (1) a "plaintiff must

---

[8] Although the Court only specifically engages in an analysis of the standing of Plaintiffs Herron and Levinson, the analysis applied to these two plaintiffs is equally applicable to the original plaintiffs.

49

have suffered an injury in fact - an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *U.S. v. Hays*, 515 U.S. 737, 742-743, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). Apart from the constitutional limitations, several prudential principles bear on the question of standing. First, "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction", *Warth,* 422 U.S. at 499, and a generalized grievance against allegedly illegal governmental conduct is therefore not sufficient for standing to invoke the federal judicial power, *Hays*, 515 U.S. at 743. Second, "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth,* 422 U.S. at 499. Finally, "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett*, 520 U.S. at 162.

Although "it is the burden of the party who seeks the exercise of jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute," *Hays*, 515 U.S. at 743 (internal quotation marks and citations

omitted), when ruling on a motion to dismiss predicated on a lack of standing, such as what

Defendant Cortes is currently asking this Court to do,

> both the trial and reviewing courts must accept as true all material allegations
> of the complaint, and must construe the complaint in favor of the complaining
> party. At the same time, it is within the trial court's power to allow or to
> require the plaintiff to supply, by amendment to the complaint or by affidavits,
> further particularized allegations of fact deemed supportive of plaintiff's
> standing. If, after this opportunity, the plaintiff's standing does not adequately
> appear from all materials of record, the complaint must be dismissed.

*Warth,* 422 U.S. at 501-502.

As the Third Circuit has reiterated, in analyzing the three elements necessary to

satisfy the constitutional minimum of standing,

> each element must be supported in the same way as any other matter on
> which the plaintiff bears the burden of proof, i.e., with the manner and degree
> of evidence required at the successive stages of the litigation. While
> generalized allegations of injury may suffice at the pleading stage, a plaintiff
> can no longer rest on such "mere allegations" in response to a summary
> judgment motion, but must set forth "specific facts" by affidavit or other
> evidence. As the Supreme Court concluded, because it is not sufficient that
> jurisdiction may be inferred argumentatively from averments in the
> pleadings[,] it follows that the necessary factual predicate may not be gleaned
> from the briefs and arguments themselves.

*Pa. Prison Soc. v. Cortes,* 508 F.3d 156, 161-162 (3d Cir. 2007) (internal quotation marks

and citations omitted).

As pleaded, Plaintiff Herron is a current senior judge of the Pennsylvania Court of

Common Pleas, Philadelphia County, and Plaintiff Levinson is an inactive member of the

Pennsylvania Bar. Each Plaintiff, including Herron and Levinson, is a resident and citizen of

the Commonwealth of Pennsylvania, a registered voter, a taxpayer of the Commonwealth of

Pennsylvania, and is eligible and intended to vote in the November 2016 general election in the Commonwealth of Pennsylvania. (Doc. 17, ¶¶ 1-5). The Second Amended Complaint does not allege that any plaintiff himself was misled by the ballot question. Rather, Plaintiffs allege that "[t]he Secretary's ballot question is misleadingly designed to garner 'yes' votes from voters who are unaware that there is currently a judicial retirement age set forth in the Pennsylvania Constitution but who are in favor of a mandatory judicial retirement age" and that these "voters would be misled into voting 'yes' to the Secretary's ballot question, believing that they are voting for imposing a mandatory retirement age where none exists, and would be shocked to learn that a 'yes' vote is really for increasing the current constitutionally-mandated judicial retirement age by 5 years." (Doc. 17, ¶¶ 118, 119). Plaintiffs further allege that the Secretary's "deceitful plan" violates "Plaintiffs' due process rights . . . dilutes and debases Plaintiffs' votes while also causing there to be judges on Pennsylvania state court benches whose tenures were not approved through a valid constitutional vote." (Id. at ¶ 120). Plaintiffs apparently are thus bringing their claims on two grounds: (1) on behalf of other, unidentified, voters who they assume will be, and now have been, misled by the Secretary's ballot question; and (2) on behalf of themselves for a violation of their due process rights.

Plaintiffs' first ground as a basis for standing is entirely without merit. No plaintiff alleges that he misunderstood the ballot question or was misled by the Secretary's language, only that other voters were and did, and therefore no Plaintiff has any connection

in this respect to those purportedly misled voters. Plaintiffs cannot bring a claim on behalf of voters who are clearly not similarly situated to them in this key respect. See e.g., Bishop, 575 F.3d at 424 ("If there is an interest in maintaining the effectiveness of votes, it is held by those voters who were misled by the amendment process. The plaintiffs' interest, by contrast, is merely a claim of the right, possessed by every citizen, to require that the Government be administered according to law. This type of abstract, generalized interest clearly fails to meet the requirement that an injury be concrete and particularized.") (internal citations and quotation marks omitted).

Additionally, to the extent that Plaintiffs are arguing that they can bring a claim based on the alleged deception of certain voters resulting in a "dilution" or "debasement" of Plaintiffs' votes, such an argument is misplaced. The concept of vote dilution has traditionally, and almost uniformly, been applied to actions involving the Equal Protection Clause, a civil rights claim which has not been raised, and is not at issue, in the present action. Plaintiffs' reliance on Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (Doc. 31, at 18) is misguided where there, the Court was evaluating the apportionment of General Assembly members among the state and the "debasement" of votes in certain districts vis-à-vis the power of votes in other districts. The power of certain individual's votes was allegedly disproportionate to those of other state voters. Here, there is no allegation that Plaintiffs' votes were not of equal importance or weight as those of any

other voter. Further, the Court's holding in *Baker* rested on the Equal Protection Clause, not

the Due Process Clause:

> It is clear that appellants' federal constitutional claims rest exclusively on
> alleged violation of the Fourteenth Amendment. Their primary claim is that the
> 1901 statute violates the Equal Protection Clause of that amendment. There
> are allegations invoking the Due Process Clause but from the argument and
> the exhibits it appears that the Due Process Clause argument is directed at
> certain tax statutes. Insofar as the claim involves the validity of those statutes
> under the Due Process Clause we find it unnecessary to decide its merits.

*Baker*, 369 U.S. 186, 194 n.15.[9]

With respect to Plaintiffs' argument that they have standing because their due

process rights were violated, such a generalized grievance is insufficient to confer standing

on any one of them, and particularly for purposes of this analysis, on Levinson and Herron.

Plaintiff Levinson did not allege sufficient facts to demonstrate that he has suffered

an injury in fact. The Second Amended Complaint merely alleges that, in addition to being a

resident and citizen of the Commonwealth of Pennsylvania, a registered voter, and a

taxpayer of the Commonwealth of Pennsylvania who is eligible and intended to vote in the

November 2016 general election in Pennsylvania, he is an inactive member of the

Pennsylvania Bar. (Doc. 17, ¶ 5). The Second Amended Complaint contains no facts

demonstrating how Levinson will suffer any "imminent" or "actual" injury due to the ballot

language. Plaintiffs' brief in opposition to the motion to dismiss fails to offer any argument

---

[9] Furthermore, although "[a] citizen's right to a vote free of arbitrary impairment by state action has
been judicially recognized as a right secured by the Constitution, when such impairment resulted from
dilution by a false tally, or by a refusal to count votes from arbitrarily selected precincts, or by a stuffing of
the ballot box," *Baker*, 369 U.S. at 208, the present case also does not allege any facts that "arbitrarily"
impair any of Plaintiffs' rights in a similar fashion.

54

to the contrary. The only specific reference to any harm that Levinson may suffer is Plaintiffs' claim that "as members of the Pennsylvania Bar, Plaintiffs Sprague, Herron, and Levinson will be subject to unlawfully delegated disciplinary and oversight authority." (Doc. 31, at 20). This injury to Levinson is entirely speculative, particularly in light of Levinson's current status as an inactive member of the Bar. The only sense in which Levinson's interest is any more "particularized" than any other Pennsylvania voter is that he was at one time an attorney. This constitutes nothing more than an asserted harm that is a "'generalized grievance' shared in substantially equal measure by all or a large class of citizens", namely any Pennsylvania taxpayer and voter who is an attorney or former attorney, a harm which "alone normally does not warrant exercise of jurisdiction." *See Warth*, 422 U.S. at 499.[10]

Plaintiff Herron is also a resident and citizen of the Commonwealth of Pennsylvania, a registered voter, a taxpayer of the Commonwealth of Pennsylvania, and is eligible and intended to vote in the November 2016 general election in Pennsylvania. (Doc. 17, ¶ 4). In addition, Herron is a current senior judge of the Pennsylvania Court of Common Pleas, Philadelphia County. (*Id.*). Plaintiffs assert in their brief that "as a sitting judge in the

---

[10] This Court recognizes that "to deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody," and therefore, "standing is not to be denied simply because many people suffer the same injury." *U.S. v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 687-688, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Here, Levinson lacks standing not because there are potentially a significant number of individuals similarly situated to him, but rather because his injury is not alleged to be imminent and appears to be entirely speculative and hypothetical.

Commonwealth of Pennsylvania, Plaintiff Herron will be imminently subject to the supervisory and appellate authority of state court judges to whom such authority was unlawfully delegated through the Secretary's misleading ballot question and the resulting unfair election process." (Doc. 31, at 20). Plaintiffs do not explain with any specificity what "unlawful" authority these judges will exercise over Herron nor how it is concrete or will specifically harm him. Further, to the extent that Plaintiffs' argument is that Herron will be subject to unlawful judicial review, there is no harm and therefore no causation pleaded. As Defendant properly notes, the Pennsylvania Code provides that retired judges may continue to serve on the bench. (Doc. 32, at 9). This Code provides that a magisterial district judge, judge, or justice who has satisfied certain requirements may remain in senior status generally until the age of 78. See Pa. Code 701.[11] Thus, Judge Herron's decisions could still be subject to review by the same judge who previously would have been forced to retire at age 70, with the only difference being that the judge would have been acting in the capacity of a senior judge instead of as an active judge. Additionally, to the extent that the supervisory and appellate authority is one dictated by the decision or vote of a panel or committee of judges, Plaintiff Herron would have to allege, and later present evidence, that such decisions would be different had the allegedly unlawful judges not been on the panel. To allege that any actions taken against Herron would be different, or remedied, if certain

---

[11] Additionally, the Court notes that the Pennsylvania Constitution itself permits "[a] former or retired justice or judge [to], with his consent, be assigned by the Supreme Court on temporary judicial service as may be prescribed by rule of the Supreme Court." Pa. Const. art. V, § 16(c).

judges were not on the bench is merely speculative in the absence of any supportive factual allegations to the contrary which show an actual and present case or controversy.

For the aforementioned reasons, this Court will find that Plaintiffs Sprague, Castille, Zappala, Levinson, and Herron do not have standing to bring the present action.

### E. Application of the *Pullman* Abstention Doctrine

Defendant next argues that, to the extent Plaintiffs allege that state law remains unsettled, he is entitled to have this case dismissed on the basis of *Pullman* abstention. (*See* Doc. 20, at 21-27).

"Abstention from the exercise of federal jurisdiction is appropriate only under certain limited circumstances, for abstention is 'the exception, not the rule.'" *Chez Sez III Corp. v. Twp. of Union*, 945 F.2d 628, 630-631 (3d Cir. 1991) (citing *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 236, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984)). The *Pullman* abstention doctrine derives its name from the Supreme Court's decision in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), which dictates that "when a federal court is presented with both a federal constitutional issue and an unsettled issue of state law whose resolution might narrow or eliminate the federal constitutional question, abstention may be justified under principles of comity in order to avoid 'needless friction with state policies.'" *Chez Sez III Corp.*, 945 F.2d at 631 (citing *Pullman*, 312 U.S. at 500). The *Pullman* abstention doctrine "should be rarely

invoked" and therefore in deciding whether to abstain under *Pullman*, a court should

determine whether three "special" or "exceptional circumstances" exist:

> First, there must be "uncertain issues of state law underlying the federal constitutional claims." *Presbytery of N.J. of the Orthodox Presbyterian Church v. Whitman,* 99 F.3d 101, 106 (3d Cir. 1996), *cert. denied,* 520 U.S. 1155, 117 S.Ct. 1334, 137 L.Ed.2d 494 (1997). Second, the state law issues must be amenable to a state court interpretation which could "obviate the need to adjudicate or substantially narrow the scope of the federal constitutional claim." *Id.* Third, it must be that "an erroneous construction of state law by the federal court would disrupt important state policies." *Id.* If all three circumstances are present, the District Court is then required to determine, in the Court's discretion, "whether abstention is appropriate by weighing such factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants." *Artway [v. Attorney Gen. of N.J.,* 81 F.3d 1235, 1270 (3d Cir. 1996)].

*Planned Parenthood of Cent. N.J. v. Farmer,* 220 F.3d 127, 149-150 (3d Cir. 2000); *see*

*also, Chez Sez III Corp.,* 945 F.2d at 631.

No exceptional circumstances exist in the present case such that this Court should

abstain pursuant to *Pullman*. First, there are no "uncertain issues of state law underlying

the federal constitutional claims." The majority of justices on the Pennsylvania Supreme

Court agreed that the Court's decision in *Stander v. Kelley* was the controlling case in

determining whether the language of the state ballot measure met state constitutional

requirements. Even assuming, without deciding, that the Court's deadlock on the merits of

Plaintiffs' action left the specific question of whether the ballot question at issue is

unconstitutional, this is not sufficient to invoke the "rare" application of *Pullman*. Second,

and of key importance, is that the state courts, including the Pennsylvania Supreme Court,

had several opportunities to decide the issue of whether the ballot question at issue violated the state constitution in a way which could have made federal proceedings unnecessary and did not do so. Rather, the highest state court deadlocked on the merits of Plaintiffs' claims and subsequently affirmed the Commonwealth Court's decision that the claims were thereafter res judicata. Plaintiffs are therefore left without any remedy in state court or any way to place the issue before a state court which would "obviate the need to adjudicate or substantially narrow the scope of the federal constitutional claim." Third, while there is no doubt that federal courts should be exceptionally wary to invade the province of state courts and involve themselves in state election disputes, and the last *Pullman* factor therefore favors the Secretary, this circumstance alone does not make *Pullman* applicable. Finally, equitable considerations also weigh against abstention. As previously noted, there is no longer an adequate state remedy available to the Plaintiffs. Further, as both the plaintiffs and defendant have made clear, an expeditious decision in this action is necessary. Thus, further delay in this case, and uncertainty as to the constitutionality of the ballot question and therefore the implementation of the election results, would have a significant impact on the litigants.

For the aforementioned reasons, the Court will decline to dismiss this case on the basis of the *Pullman* abstention doctrine.[12]

---

[12] Within the Secretary's section arguing that the *Pullman* Abstention doctrine applies, and specifically with relation to the first element necessary to apply *Pullman* – uncertain issues of state law underlying the federal constitutional claims – the Secretary states that the Court lacks jurisdiction over the state-law claim that the Secretary violated the Pennsylvania Constitution because such claims are barred

## F. Failure to State a Claim Upon which Relief can be Granted

For the reasons set forth at length in the preceding sections of this memorandum opinion, it is this Court's view that the claims of Plaintiffs Sprague, Castille and Zappala are barred by res judicata and that those three Plaintiffs, as well as Plaintiffs Herron and Levinson, lack standing to bring this suit.

Nonetheless, for purposes of analytical completeness, and appellate review, the Court addresses the Defendant's Motion to Dismiss the Plaintiffs' Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).

Plaintiffs' Second Amended Complaint is 50 pages in length and contains 142 paragraphs. The factual allegations in the Plaintiffs' Complaint have been recounted in Section II of this memorandum and will not be repeated here in their entirety. However, consistent with the instruction of this Circuit with respect to the application of *Iqbal* and *Twombly*, this Court "[t]akes as true all the factual allegations in the [Second Amended Complaint] and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm,* 707 F.3d at 231 n.14.

---

by the Eleventh Amendment. While this Court does not find the *Pullman* abstention doctrine applicable to the present case, we recognize that Plaintiffs' state law claim would be jurisdictionally barred by Eleventh Amendment immunity if it was not already subject to dismissal pursuant to the principle of res judicata, and Plaintiffs' lack of standing as set forth in this memorandum opinion. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (holding that a supplemental state law claim that attempts to compel a state to comply with state law is barred by the Eleventh Amendment).

The Plaintiffs' Second Amended Complaint sets forth the legislative path that led to the ballot language at issue in this case as well as the history of the litigation that ensued in state court which preceded Plaintiffs' resort to the federal court. These matters are set forth in considerable detail in paragraphs 18 through 111 of the Second Amended Complaint. Thus, the operative allegations of the Plaintiffs' Second Amended Complaint in support of their claim that the ballot question at issue was unlawfully misleading[13] are those set forth at paragraphs 112 through 121, as well as the allegations that are repeated in Counts I, II and III of the Second Amended Complaint. A review of these paragraphs shows that they present, in the main, legal argument and conclusions of law. (*See e.g.*, Doc. 17, ¶ 112 ("In a democracy, it is indisputable that voters are required to have the information necessary to make the best decisions on matters of critical importance such as a constitutional amendment regarding the retirement age of state judicial officers."); *id.* at ¶ 116 ("In order to be lawful, the ballot question concerning the Pennsylvania General Assembly's proposed amendment to Article V, Section 16(b) of the Pennsylvania Constitution must ask whether voters wish to *raise* the current mandatory judicial retirement age from 70 to 75, not merely whether voters are in favor of a constitutionally-mandated judicial retirement age of 75.") (italics in original.)).

The Second Amended Complaint does allege that the Pennsylvania Constitution "currently requires that the Commonwealth's jurists retire on December 31 of the year in

---

[13] The Pennsylvania electorate voted to approve the ballot question at the general election held on November 8, 2016 with the ballot question passing with 50.86% of the vote. (Doc. 20, at 3 n.4).

61

which they attain the age of 70" (*id*. at ¶ 113), and that "[u]nder the General Assembly's proposal, Pennsylvania Supreme Court justices, judges and magisterial district judges of the Commonwealth would be required to retire on the last day of the year in which they attain the age of 75, rather than the age of 70, as currently required under Article V, Section 16(b) of the Pennsylvania Constitution." (*Id*. at ¶ 114).

The Complaint further alleges that "[b]efore the General Assembly's proposal can result in an amendment to the Constitution, it must be presented to the qualified electorate and approved by a majority vote. Pa. Const. Art. XI, § 1." (*Id*. at ¶ 115). Plaintiffs thus allege that the "Secretary will present the Pennsylvania electorate in the November 2016 general election with a ballot question that omits any reference to the Pennsylvania Constitution's current compulsory judicial retirement age, despite previously arguing before the Pennsylvania Supreme Court that voters would be misled by a ballot question that does not include such information." (*Id*. at ¶ 117).

Plaintiffs in paragraphs 118 through 121 present the essence of their challenge to the ballot language in question in a comingled allegation of fact and argument:

> 118. The Secretary's ballot question is misleadingly designed to garner "yes" votes from voters who are unaware that there is currently a judicial retirement age set forth in the Pennsylvania Constitution but who are in favor of a mandatory judicial retirement age.
>
> 119. Such voters would be misled into voting "yes" to the Secretary's ballot question, believing that they are voting for imposing a mandatory retirement age where none exists, and would be shocked to learn that a "yes" vote is really for increasing the current constitutionally-mandated judicial retirement age by 5 years.

120. The effectiveness of the Secretary's deceitful tactic is plain, as noted in Justice Wecht's Second Opinion, which will violate Plaintiffs' due process rights and dilute and debase Plaintiffs' votes while also causing there to be judges on Pennsylvania state court benches whose tenures were not approved through a valid constitutional vote . . . .

121. Simply stated, voters will be intentionally misled by the ballot question into voting contrary to their intentions, and the election results will not reflect the Pennsylvania voters' true will.

(Doc. 17, ¶¶118-121).

These mixtures of allegations of fact, conclusions of law and argument are repeated in Count I – Declaratory Judgment (*see, e.g.,* Doc. 17, ¶¶ 123, 124); in Count II – Injunctive Relief (*id.* at ¶¶ 129, 130, 133, 134); and in Count III – Declaratory and Injunctive Relief under Pennsylvania Law (*id.* at ¶¶ 139, 141).

In order to evaluate whether Plaintiffs have stated a cause of action under the Federal Constitution, the applicable standard of review to be applied to the ballot language at issue must first be identified. The decision in *Burton v. State of Georgia*, 953 F.2d 1266 (11th Cir. 1992), presents a standard that has been consistently followed by other courts in resolving issues of the constitutional propriety of ballot language. In *Burton*, a Georgia citizen and two organizations, Georgia Citizens Action and Common Cause/Georgia, brought suit challenging the constitutionality of ballot language selected by Georgia's legislature for a proposed amendment to the Georgia Constitution. The amendment affected the ability of citizens to sue the State of Georgia, its departments, agencies, officers and employees. *Id.* at 1267. The amendment would have allowed the state legislature to

create a state court of claims and eliminate the state's pre-existing policy of waiving

sovereign immunity for claims covered by liability insurance. *Id.*

Under Georgia's Constitution, its voters were required to approve any amendments

thereto. The language of "Amendment One," which sought this change to the Georgia

Constitution, stated:

> Shall the Constitution be amended to provide that the General Assembly may
> authorize lawsuits against the state and its departments, agencies, officers,
> and employees and to provide how public officers and employees may and
> may not be held liable in court?

*Burton*, 953 F.2d at 1267. The referendum passed and Plaintiffs brought suit under 42

U.S.C. § 1983, asserting that the ballot language misled voters to such an extent that it

violated their right to vote protected by the Federal Constitution's Due Process Clause. The

plaintiffs argued that the proposed amendment "misled voters into believing that the

amendment would make it easier to sue the state," while plaintiffs contended that "the

amendment would actually make suing the state significantly more difficult by broadening

sovereign and official immunity." *Id.* The District Court denied plaintiffs' relief and the Court

of Appeals affirmed.

The Circuit recognized that the Constitution of the United States protects the rights of

all qualified citizens to vote in state and federal elections. *Id.* at 1268. The Court quoted the

Supreme Court, noting that "[t]he right of suffrage can be denied by the debasement or

dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free

exercise of the franchise." *Id.* (quoting *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362,

12 L.Ed.2d 506 (1964)).

The Court in *Burton*, however, noted that "[p]rinciples of federalism limit the power of

federal courts to intervene in state elections," and further stated that "[t]he Constitution

leaves the conduct of state elections to the states." *Id.* (internal quotation marks omitted).

The Court continued in its analysis:

Because the Constitution largely contemplates state regulation of state elections, we have long recognized that not every state election dispute implicates federal constitutional rights. "Only in extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation." *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986). In most cases, irregularities in state elections are properly addressed at the state level, whether through state courts or review by state election officials. *See Griffin v. Burns*, 570 F.2d 1065, 1078 (1st Cir. 1978) ("[D]ue process is implicated where the entire election process – including as part thereof the state's administrative and judicial corrective process – fails on its face to afford fundamental fairness.").

*Id.*

Turning to the ballot language at issue there, the Court began by observing that "[w]e

are aware of no cases in which a federal court has invalidated a state election on grounds

like those asserted by plaintiffs." *Burton*, 953 F.2d at 1269. Instead, the Court set forth the

requirements necessary for such relief:

For such extraordinary relief to be justified, it must be demonstrated that the state's choice of ballot language so upset the evenhandedness of the referendum that it worked a "patent and fundamental unfairness" on the voters. Such an exceptional case can arise, in the context of a case such as this one, only when the ballot language is so misleading that voters cannot recognize the subject of the amendment at issue. In such a case, the voters

would be deceived, in a concrete and fundamental way, about "'what they are voting for or against.'"

*Id.*

The Court in *Burton* then emphasized that "[a]s long as citizens are afforded reasonable opportunity to examine the full text of the proposed amendment, broad-gauged unfairness is avoided if the ballot language identifies for the voter the amendment to be voted upon. Therefore, substantive due process requires no more than that the voter not be deceived about what amendment is at issue." *Id.*

In *Burton,* the Georgia legislature had chosen to identify an amendment by briefly summarizing the amendment's text, *id.* at 1270, an approach not taken by the Pennsylvania legislature here, which printed the full text of the amendment.  Yet, the Court in *Burton* nonetheless held that ballot language which "purports to identify the proposed amendment by briefly summarizing its text" was not constitutionally infirm:

> When the ballot language purports to identify the proposed amendment by briefly summarizing its text, then substantive due process is satisfied – and the election is not "patently and fundamentally unfair" – so long as the summary does not so plainly mislead voters about the text of the amendment that "they do not know what they are voting for or against"; that is, they do not know which or what amendment is before them.

*Id.* The Court found that the ballot language which briefly summarized the text of the amendment to the Georgia Constitution passed this "deferential due process test." *Id.*

As to the Plaintiffs' complaint that the ballot language misled voters about the effect

the amendment would have on the ability of citizens to sue the state of Georgia, the Court

responded:

> We cannot accept the proposition that substantive due process imposes an affirmative obligation on states to explain – some might speculate – in ballot language the potential legal effect of proposed amendments to the state constitution. . . .
>
> We see no "patent and fundamental unfairness" inherent in the state's failure, if any, to convey the legal effect of Amendment One – that is, to explain the current state of Georgia immunity law and the changes that Amendment One would likely bring about if adopted. The ballot language is intended only to identify for the voters the amendment to be passed upon; voters must inspect the text of the amendment itself to determine, for themselves, the legal effect of its passage.

*Burton*, 953 F.2d at 1270.

Finally, in words that have application to the claim before this Court that the ballot

language does not pass constitutional muster because other language would have better

informed the voters as to the effect of the amendment, the Court in *Burton* rejected a similar

contention, explaining:

> Were we to adopt plaintiffs' contention, however, every amendment summary would be subject to federal court consideration of whether the change in the law implied by the ballot language is a "fair" representation of the amendment's actual import – whatever that may be. So long as the election process is not so impaired that it is "patently and fundamental unfair," substantive due process is satisfied. It is not for federal courts to decide whether the state General Assembly could have selected some other language, or some other approach, that might have better informed the voters of Amendment One's content. It is, by now, absolutely clear that the Due Process Clause does not empower the judiciary to sit as a superlegislature to weigh the wisdom of legislation.

*Id.* at 1271 (internal quotation marks omitted).

Finally, in *Burton*, the Court took note that at trial the plaintiffs had offered expert testimony and "some statistical support" for "the proposition that many voters may have relied entirely on the ballot language in deciding how to vote on Amendment One." Nonetheless, the Court offered:

> Accepting this as true, we cannot say that the entire election was infected with "patent and fundamental unfairness;" the state properly relied on its citizenry to inform itself about the current state of Georgia immunity law and the likely effects of Amendment One's passage.

*Id.*

This Court finds persuasive the reasoning of the Court of Appeals in *Burton*. Here, unlike the amendment at issue in *Burton*, the entire text of the proposed amendment to the Pennsylvania Constitution was included in the ballot language presented to the voters. As the Court in *Burton* noted, it is not for federal courts to decide whether the General Assembly "could have selected some other language that might better have informed the voters" of the content of the amendment and the change it would make to the current text of the Pennsylvania Constitution. Just as the Court in *Burton* found that the state of Georgia "properly relied on its citizenry to inform itself about the current state of Georgia immunity law and the likely effects of Amendment One's passage," 953 F.2d at 1271, so, too, the General Assembly of Pennsylvania likewise properly relied upon its citizenry to inform itself about the current state of mandatory retirement for Pennsylvania's judges and the effect of

passage of the proposed amendment requiring retirement at age 75 for the members of the

Pennsylvania judiciary. That information was easily accessible since the Secretary, in

accordance with the Pennsylvania Election Code, circulated and published in newspapers

across the Commonwealth, an explanation of the ballot question, including the full text of

the amendment. Designated the "Plain English Statement," this explanation without

question describes the effect of the ballot question presented to the voters and

unequivocally indicated that it would permit all justices, judges and magisterial judges to

serve an additional five years beyond the then-current required retirement age. (See Doc.

17, Ex. R, at 319). As the Secretary contends in his Reply Brief, "[i]f an elector wished to

learn more about the current law, the elector need look no further than this Statement.

Each county elections board also posted the Statement in polling places. 25 P.S. § 2621.1."

(Doc. 32, at 3).

The Ninth Circuit adopted the standard set forth in the Burton v. Georgia for

determining whether a federal court may grant relief on a challenge to a state's choice of

ballot language in National Audubon Society, Inc. v. Davis, 307 F.3d 835 (9th Cir. 2002). In

Audubon, several non-profit organizations which supported the protection and conservation

of birds, challenged Proposition 4, adopted by the California voters to protect wildlife and

domestic pets by restricting the use of certain kinds of steel-jawed leg hold animal traps by

any person, including a federal employee. The District Court granted summary judgment for

the plaintiff organizations on the basis that the leg trap ban violated the National Wildlife

Refuge System Improvement Act and was preempted by the Endangered Species Act and the Migratory Bird Treaty Act and dismissed the trappers' claims on the basis that they lacked standing. In affirming in part, reversing in part, and remanding for further proceedings, the Court of Appeals affirmed the District Court's ruling that the ballot material did not violate the substantive due process test under *Burton*. The trappers had claimed that Proposition 4 was materially misleading and objected to certain language in the section of the ballot materials entitled "Argument in Favor of Proposition 4". *Id.* at 858.

The Court of Appeals noted that the parties did not dispute the legal standard as set forth in *Burton, id.*, recounted earlier herein. The Court affirmed the District Court's determination that the description in the ballot material was not "materially misleading". It reasoned that the allegedly false statement was in what it termed an "avowedly partisan" portion of the materials and "not in the text of the proposition or in the neutral legislative analysis of the proposition." *Id.* On that basis, the Court agreed "with the district court's conclusion that the ballot material did not rise to the level of a substantive due process violation under *Burton*." *Id.* at 859.

In the present case, there were no "avowedly partisan" portions of the public notice required by Pennsylvania law to be placed in the newspapers in each county of the Commonwealth and to be placed at the various Commonwealth polling places. Yet, the focus of the Court in *Audubon* on the "neutral legislative analysis of the proposition" as a basis for finding the absence of a substantive due process violation has application to the

70

case before this Court. Here, the public notice of the proposed amendment to the

Constitution of Pennsylvania presents the same neutral and informative analysis that the

Court in *Audubon* relied upon in determining the language of Proposition 4 did not deprive

the voters of substantive due process. The Plain English Statement of the Office of

Attorney General, states in part:

> The purpose of the ballot question is to amend the Pennsylvania Constitution
> to require that justices, judges and justices of the peace (known as
> magisterial district judges) be retired on the last day of the calendar year in
> which they attain the age of 75 years.
>
> Presently, the Pennsylvania Constitution provides that justices, judges and
> justices of the peace be retired on the last day of the calendar year in which
> they attained the age of 70 years. Justices of the peace are currently referred
> to as magisterial district judges.
>
> If the ballot question were to be approved, justices, judges and magisterial
> district judges would be retired on the last day of the calendar year in which
> they attain the age of 75 years rather than the last day of the calendar year in
> which they attain the age of 70 years . . . .

(Doc. 17, Ex. R, at 319).

> *Burton* was again followed in *Missouri Roundtable for Life v. Carnahan*, 676 F.3d

665 (8th Cir. 2012). There, the plaintiff, availing itself of the opportunity under Missouri law

for citizen initiatives to be submitted as proposed constitutional amendments, submitted 13

such proposed constitutional amendments to the Missouri Secretary of State. The process

required that state officers then prepare a summary statement, fiscal note summary, and

fiscal note for each proposed constitutional amendment. 676 F.3d at 668. The plaintiff

alleged in its federal court action that the summary prepared by Secretary of State

Carnahan and the State Auditor "continuously and persistently stymied and frustrated" its intended messages in violation of its constitutional rights and Missouri law. *Id.* Plaintiff further alleged that the state officers had violated its First and Fourteenth Amendment rights "by intentionally modifying key language and improperly characterizing its proposed amendments to undermine its political message." *Id.* at 671. The District Court granted the Secretary's motion to dismiss and the Court of Appeals affirmed.

While many of the issues addressed in *Carnahan* have no similarity to those before this Court in light of the citizen initiative aspect of Missouri law allowing amendments to the constitution to be submitted through a process with the amendments originating with citizens rather than in the legislature, the plaintiff in *Carnahan* did allege that its substantive due process rights had been violated because the official ballot titles which had been prepared by state officers "distorted their messages in such a manner that voters would have been fundamentally misled." *Id.* at 678. The Court of Appeals, in affirming the District Court's dismissal of this claim, began by stating that "[a] substantive due process claim requires a showing that 'a fundamental right was violated and that the conduct shocks the conscience.'" *Id.* The Court, noting that the full text of a proponent's amendment is required by Missouri law to be available with petition sheets and at the polling places during voting, found no substantive due process violation. In doing so, it relied upon *Burton,* quoting the statement in that case that "[a]s long as citizens are afforded reasonable opportunity to examine the full text of the proposed amendment, broad-gauged unfairness is

avoided if the ballot language identifies for the voter the amendment to be voted upon." *Id*. (quoting *Burton*, 953 F.2d at 1269).

Here again, the full text of the change to the Pennsylvania Constitution was set forth in the ballot question itself and the "plain English explanation" was made available to voters across the Commonwealth by newspaper advertisement and by notices at the polling places. Perhaps most significant, however, is that there is no question in this case that the ballot met the test set forth in *Burton* and quoted in *Carnahan*, i.e., the ballot language in this case identified for the voter the amendment to be voted upon. That is to say, no reasonable reading of the ballot language allows for the conclusion that a voter, after reading the ballot language, would not know that the issue to be voted upon was whether to amend the Pennsylvania Constitution to require that members of Pennsylvania's judiciary be retired at age 75.

The decision in *Caruso v. Yamhill County*, follows the *Burton* standard in a case involving a petition for an initiative measure to appear on the ballot in Yamhill County in accordance with the provision of the Oregon Constitution which reserved to the people "the initiative power, which is to propose laws and amendments to the Constitution and enact or reject them at an election independently of the Legislative Assembly." 422 F.3d 848, 851 (9th Cir. 2005). In this case, under Oregon law, ballot titles for initiatives that propose the imposition of a local option tax were required to include an additional statement referred to

as the "three-percent warning," thus notifying voters that the measure "may cause property taxes to increase more than three percent." *Id.*

The question placed before the voters pursuant to this initiative process was: "Shall voters authorize levy of $0.003 per $1,000 of assessed valuation if Yamhill County People's Utility District is formed?" *Id.* The question was followed with the statement that "[t]his measure may cause property taxes to increase more than three percent." *Id.* A summary of the measure then followed. *Id.* at 852.

Plaintiff Caruso challenged the constitutionality of the section of the law requiring the inclusion of the three percent warning as violative of his First Amendment and due process rights as a voter. The District Court deemed the three percent warning "false and misleading" because it implied that the initiative measure "by itself" may cause property taxes to increase more than three percent when the increase proposed by the measure at issue was in fact much lower, i.e., "$0.003 per $1,000 of assessed valuation." *Id.*

The Court of Appeals reversed. In doing so, it set forth the standard applied in *Burton* and adopted in subsequent cases for determining whether ballot language presents a denial of substantive due process:

> "Several appellate courts, including our own, have held that an election is a denial of substantive due process if it is conducted in a manner that is fundamentally unfair." *Bennett v. Yoshina,* 140 F.3d 1218, 1226 (9th Cir.1998). To prevail on his substantive due process claim, then, Caruso must demonstrate that "'the state's choice of ballot language so upset[s] the evenhandedness of the [election] that it work[s] a 'patent and fundamental unfairness' on the voters.'" *Nat'l Audubon Soc'y, Inc. v. Davis,* 307 F.3d 835, 858 (9th Cir.2002) (quoting *Burton v. Georgia,* 953 F.2d 1266, 1269 (11th

Cir.1992)). The parties agree that such an exceptional case would arise if, for example, the ballot language were so misleading as to deceive voters about the subject of the measure at issue. *See id.*

*Caruso,* 422 F.3d at 863.

The Court then cited its prior decision in *National Audubon Society* and stated:

Like the material challenged in *National Audubon Society,* the three-percent warning is "not completely inaccurate." To be sure, the three-percent warning might have been read as a misleading suggestion that Measure 36-55 by itself might cause property taxes to increase more than three percent. But, as described above, the warning might also have been read, in context, as an accurate reminder that the proposed local option tax would not be subject to the three-percent limit imposed by the Oregon Constitution. Moreover, although an average voter might have read the three-percent warning as Caruso does "'[i]f [he] had to decide what he was voting on from the [warning] alone, . . . . he did not have to decide from this summary.'" *Burton,* 953 F.2d at 1271 .

*Id.* Instead, the Court pointed out that Caruso could look to "other materials" – including

"the text of Measure 36-55 and the remainder of the ballot title as it appeared in the voters'

pamphlet and, indeed, on the ballot itself . . . – which indicated the actual increase

proposed by Measure 36-55, disclosing both the dollar rate of the proposed tax and the

estimated levy for a house with an assessed value of $150,000." *Id.*

Accordingly, the Court concluded that "[w]e are thus unpersuaded that the State's

choice of ballot language rose to the level of a due process violation under *National*

*Audubon Society." Id.*

Finally, the Court added:

Because the three-percent warning could have been interpreted accurately, and because "other materials" would have enforced this interpretation, we

75

cannot say that including the three-percent warning in the ballot title would have "infected" the entire election with "patent and fundamental unfairness." *Burton*, 953 F.2d at 1271 (internal quotation marks omitted).

*Id.* at 863-864.

What may be gleaned from the reasoning of the Ninth Circuit in *Caruso* on a matter presenting a ballot issue distinctly different from that before this Court is that the voter in Pennsylvania, like the "average voter" in *Caruso*, had "other materials" to consult if he/she needed additional information before casting a ballot for or against the constitutional amendment requiring members of the judiciary of Pennsylvania to retire on the last calendar day of the year in which they reach age 75. The voter in *Caruso* could examine the text of the measure at issue and what the Court termed the "remainder of the ballot title as it appeared in the voters' pamphlet and, indeed, on the ballot itself." *Caruso*, 422 F.3d at 863. These materials, according to the Court in *Caruso*, indicated the actual increase proposed by Measure 36-55, "disclosing both the dollar rate of the proposed tax and the estimated levy for a house with an assessed value of $150,000." *Id.* In the present case, the voter had the exact text of the amendment to the Pennsylvania Constitution set forth on the ballot and, to the extent the hypothetical undecided or hypothetical confused voter wished to obtain additional information, he/she needed only consult the "Plain English Statement," which, as previously noted, was circulated by the Secretary and published in newspapers across the Commonwealth and which was posted in all polling places.

By the rationale of *Caruso,* the ballot language presented to the voters in this case told voters precisely what was to be voted upon, was presented in language which allowed an accurate interpretation, and other materials were available to the extent that a voter sought further information or clarity.

In the language of *Burton, supra*, at 953 F.2d 1270, in this case may it be said that the ballot language on its face so plainly misled Pennsylvania's voters about the text of the amendment that "they [did] not know what they [were] voting for or against; that is, they [did] not know which or what amendment [was] before them?"   This Court, granting to Plaintiffs every reasonable factual inference to which they are entitled at the pleading stage, cannot find this Complaint legally sufficient under applicable law.

Other district courts that have confronted this issue of the adequacy of ballot language under the Fourteenth Amendment have also reached the same conclusion, using the test set forth in *Burton*.   *See e.g., Citizens for Legislative Choice v. Miller*, 993 F.Supp. 1041 (E.D. Mich. 1998) (no substantive due process violation and ballot language not misleading where it clearly indicated that under the proposed amendment, an individual could be elected as a state representative three times notwithstanding that the words "in a lifetime" were deemed unnecessary "because the ballot's existing language was quite clear."). *See also*, *McClafferty v. Portage Count Bd. of Elections*, 661 F.Supp.2d 826 (N.D. Ohio 2009) (placement of requirement for completion of a criminal conviction disclosure form as the first proposed qualification for office of mayor with establishment of a minimum

age requirement placed last despite the recommendation of the charter review committee

for opposite placement on the ballot not a violation of due process).

The decision in *Grudzinski v. Bradbury*, 2007 WL 2733826 (D. Or. 2007), though an

unreported case nevertheless presents a well-reasoned, instructive, and ultimately

persuasive opinion in support of the dismissal of plaintiff's actions in this case. In

*Grudzinski*, the plaintiffs sought a preliminary injunction enjoining the Secretary of State

from printing the ballot title, explanatory statement and fiscal impact statement for the

Oregon ballot measure 49 in the Voters' Pamphlet or on the ballot forms and from certifying

the ballot title to each of the 36 counties in Oregon.  The plaintiffs maintained that the ballot

title and explanatory statement misled Oregon voters about the effects of Measure 49,

rendering the election fundamentally unfair.

By legislative action, Measure 49 was to be submitted to the voters through a special

election.  Plaintiffs filed suit alleging violations of their rights to due process, equal

protection, and to petition the Government for redress of grievances.

The Court denied the plaintiffs' motion for a temporary restraining order and

preliminary injunction.  The Court began its analysis by noting the clear, but circumscribed,

right to interfere with a state's election process:

> In short, plaintiffs seek the extraordinary remedy of interfering with a state's
> election process. *See Sw. Voter Registration Educ. Project v. Shelley*, 344
> F.3d 914, 918 (9th Cir. 2003) ("There is no doubt that the right to vote is
> fundamental, but a federal court cannot lightly interfere with or enjoin a state
> election."); *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176,
> 1182-83 (9th Cir. 1988) ("While we are mindful that federal courts have a duty

78

to ensure that national, state and local elections conform to constitutional standards, we undertake that duty with a clear-eyed and pragmatic sense of the special dangers of excessive judicial interference with the electoral process.").

*Id.* at *2.

With respect to the plaintiffs' claim of a violation of substantive due process, the

District Court summarized the case law that has been extensively cited in this

memorandum:

> Thus, to prevail on their substantive due process claim, plaintiffs must demonstrate that "'the state's choice of ballot language so upset[s] the evenhandedness of the [election] that it work[s] a 'patent and fundamental unfairness' on the voters.'" *Caruso v. Yamhill County ex rel. County Comm'r*, 422 F.3d 848, 863 (9th Cir. 2005) (quoting *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 858 (9th Cir. 2002) (quoting *Burton v. Georgia*, 953 F.2d 1266, 1269 (11th Cir. 1992))). For example, such an "exceptional case" would arise if the "ballot language were so misleading as to deceive voters about the subject matter of the measure at issue." *Id.* In the absence of such misrepresentation, plaintiffs cannot prevail on their substantive due process claim . . .

*Id.* at *3. As a result, "'substantive due process requires no more than that the voter not be

deceived about what amendment is at issue.'" *Id.* (quoting *Burton*, 953 F.2d at 1269).

The plaintiffs in *Grudzinski* raised several challenges to Measure 49 as misleading.

Those challenges assailed the accuracy of Measure 49 and its definition of who may be

deemed an owner under that measure; that the term "landowners" as used in the measure

conflicted with the term "owner" in connection with the right to build homes as compensation

for land use restrictions as well as in other circumstances where they contended the

measure was unclear as to whether a claimant would or would not be deemed an owner.

The Court found the ballot language was neither misleading nor inaccurate, stating that "[b]allot language cannot be expected to explain every exception, nuance, or contingency of a measure's effect, and plaintiffs' argument is based on speculation as to how courts subsequently may construe the meaning of 'prohibit' and 'restrict.'" *Id.* at *5.

With respect to other challenges to the summary statement of Measure 49, the Court, citing to *Burton*, responded that "voters can read the text of Measure 49 and determine its effect for themselves." *Id.* (citing *Burton*, 953 F.2d at 1269).

Here, the voters of Pennsylvania were presented with a ballot question which squarely presented the question to be voted upon – whether to require the members of Pennsylvania's judiciary to retire on the last day of the calendar year in which they attain the age of 75 years.

Moreover, the Plain English Statement explanation of the ballot question along with the full text of the amendment were circulated and published in newspapers throughout the Commonwealth and were posted at the polling places as required by the Pennsylvania Election Code. As previously discussed, the Plain English Statement clearly states the effect of the adoption of the amendment. (Doc. 17, Ex. R, at 319).

To the argument that the Plain English Statement may not be read (or may have not been read) by the hypothetical voter who is (or was) unsure of the meaning of the ballot language or who may not know (or may not have known) that the pre-amendment retirement age was 70 years, it is enough to say that it is difficult to accept the thesis that a

voter who has the State law provided means to learn what the Pennsylvania Constitution provided at the time the amendment was voted on and yet does not do so should be deemed to have been "deceived" by the ballot language, such that federal intervention in this matter may be justified. The ballot language, again, is clear on its face in informing voters that the effect of a "yes" vote on the ballot question is to make the mandatory retirement age for Pennsylvania's judiciary 75 years and requires retirement on the last day of the calendar year in which that age is attained.

Finally, the Court notes that whether the original ballot language proposed by the Secretary better informed Pennsylvania voters concerning the purpose and effect of the proposed amendment than the language that ultimately became the ballot language submitted to the voters on November 8, 2016, is not a question before this Court under applicable law. Thus, this Court finds it fitting to end with the admonition of the Court in Burton:

> It is not for federal courts to decide whether the state General Assembly could have selected some other language, or some other approach, that might have better informed the voters of [the ballot's] content. "[I]t is, by now, absolutely clear that the Due Process Clause does not empower the judiciary 'to sit as a superlegislature to weigh the wisdom of legislation.'"

Burton, 953 F.2d at 1271.

For these reasons, Plaintiffs have failed to state a claim upon which relief may be granted. Because any amendment to the Second Amended Complaint would be futile, Plaintiffs will not be given leave to amend.

## V. CONCLUSION

For the foregoing reasons, the Court will grant Defendant Pedro A. Cortés' Motion to

Dismiss (Doc. 19).  A separate Order follows.

Robert D. Mariani
United States District Court Judge